IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KAREN MINIEX, | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:17-CV-00624 |
| | § | |
| | § | |
| | § | |
| HOUSTON HOUSING AUTHORITY and | § | |
| TORY GUNSOLLEY, Individually, | § | |
| Defendants. | § | JURY TRIAL DEMANDED |
| | § | |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Karen Miniex ("Plaintiff" or "Ms. Miniex"), Plaintiff in the above-styled and numbered cause, and files this, her Original Complaint, complaining of Houston Housing Authority ("HHA") and Tory Gunsolley ("Gunsolley") (collectively, "Defendants"), and for causes of action would show as follows:

## I.
## INTRODUCTION

1.     This action seeks relief for myriad unlawful actions taken against Ms. Miniex by her employer HHA, culminating in the unlawful suspension from and termination of her employment.  Specifically, Ms. Miniex seeks all relief available for HHA's violations of (1) the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"); (2) the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"); and (3) the Texas Whistleblower Act, TEX. GOV'T CODE § 554.001 *et seq.*  She also seeks relief under state tort law against Gunsolley, in his individual

capacity, for his unlawful invasion of her privacy.

2.      Plaintiff demands a jury on all issues triable to a jury.

## II.
## PARTIES

3.      Plaintiff Karen Miniex is an individual residing in Harris County, Texas.  She is the former Vice-President and General Counsel of Defendant HHA.

4.      Defendant HHA is a political subdivision headquartered in Houston, Harris County, Texas.   Service of the Summons and this Complaint may be made by serving its president and chief executive officer Tory Gunsolley at 2640 Fountain View Drive, Suite 400, Houston, TX  77057.

5.      Defendant Tory Gunsolley is an individual residing in Harris County, Texas. Service of the Summons and this Complaint may be made by serving him at his place of work, 2640 Fountain View Drive, Suite 400, Houston, TX  77057, or wherever he may be found.

## III.
## JURISDICTION AND VENUE

6.      This Court has jurisdiction over Plaintiff's FMLA and FCA claims in this matter pursuant to 28 U.S.C. § 1331 because such claims arise under federal law.   Supplemental jurisdiction over Plaintiff's Texas Whistleblower Act and invasion of privacy claims is predicated on 28 U.S.C. § 1367, as such claims arise out of the same case and controversy.

7.      Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

8.      All conditions precedent to filing this lawsuit have been met.

**IV.**
**FACTS**

9.      HHA is a public housing authority tasked with providing affordable housing to low-income Houstonians.  Created by the Houston City Council in 1938, HHA is governed by a seven-member Board of Commissioners ("Board"), each of whom is appointed by the Mayor of Houston.  As of 2014, HHA was serving more than 60,000 low-income persons.

10.      The majority of funding for HHA comes from the United States Department of Housing and Urban Development ("HUD").  In 2014, HUD provided more than $125,000,000 in federal funding to the HHA, including more than $100,000,000 in funding for the Housing Choice Voucher Program ("HCVP").

11.      The HCVP, formerly known (and commonly referred to) as "Section 8", provides housing assistance in the form of a voucher to low-income families, seniors, and persons with disabilities.  HHA provides payments directly to participating property owners to offset the price of rent at the rental unit chosen by the tenant receiving the HCVP voucher.

12.      As part of the HCVP, HHA also administers a unique HUD program known as Veterans' Affairs Supportive Housing ("HUD-VASH") vouchers, which are allocated specifically to provide housing vouchers to homeless U.S. veterans.  HUD-VASH vouchers stem from a joint effort of funding through HUD and the United States Veterans' Administration ("VA").  These particular vouchers follow a different application and admissions system from the general HCVP vouchers.  A homeless U.S. veteran may only receive a HUD-VASH voucher through a verified referral by their VA caseworker to HHA.  Prior to referring any veteran to HHA for housing assistance, the VA verifies that the veteran meets certain eligibility requirements, which include: (1) being a veteran of the United States Armed Forces; (2) having

3

an *"Honorable Discharge"* from the U.S. military; (3) participating in supportive services through the VA with an assigned VA caseworker; and (4) passing a criminal background check. The criminal background rules are more relaxed for veterans entering through the HUD-VASH program than the rules are for the regular vouchers sought by the general population.

13.      Ms. Miniex began employment with HHA in March of 2012 as Vice-President and General Counsel.  In this role, she was HHA's Chief Legal Officer leading the Legal department and advising the President and CEO, the Board, and the executives of each department.  During 2013, Ms. Miniex assumed – by way of delegation from Defendant Gunsolley – leadership of HHA's Procurement department.  Such department had previously experienced substantial administrative malfunctioning, so this new delegation of responsibility confirmed Defendant Gunsolley's manifested confidence in Ms. Miniex's apparent business acumen, proven legal acuity, and well-documented track record of success at HHA. Additionally, Ms. Miniex volunteered – *through her two departments* – to accept leadership roles in certain other essential, yet faltering, functional areas, which had not been previously managed by either the Legal department or the Procurement department prior to Ms. Miniex's employment at HHA, such as: (1) processing of requests for reasonable accommodations/modifications for public housing tenants and voucher participants; (2) the centralization of information requests pursuant to the Texas Public Information Act (also known as TPIA); and (3) full management of HHA's appreciable vehicle fleet.  Prior to the events which have led to this lawsuit, Ms. Miniex had a successful tenure with HHA *(as an employee, multi-department manager, and executive officer)*, performing her duties with commendations from others and without any notable criticism.  She routinely received positive performance reviews and corresponding annual bonuses and/or salary raises from HHA.

4

14.    In January of 2016, Ms. Miniex suffered a catastrophic accidental ankle injury that required surgical intervention and a long, grueling recovery period at home.  Ms. Miniex applied for and was approved for leave under the FMLA.  However, despite the fact that Ms. Miniex was recovering at home and on protected FMLA leave, HHA continued to contact her regularly about varying business, legal, and employment matters.  Acting out of a mere *professional courtesy*, Ms. Miniex responded to such inquiries.  Nevertheless, such inquiries were persistent, overbearing, and constituted interference with Ms. Miniex's FMLA rights.

15.    In conjunction with her FMLA, Ms. Miniex sought short-term disability benefits through Colonial Life, the disability insurance plan for which she had been consistently paying since shortly after her tenure commenced at HHA.  After depleting the balance of her *paid time off* ("PTO") bank, Ms. Miniex's short-term disability benefits were approved and initiated; this was a necessary stream of income due to the fact that she was not being paid for her required absence from work.  However, these benefits were abruptly terminated shortly after they begun. Ms. Miniex discovered that the reason for the termination was HHA's communication to Colonial Life that she had resumed work.  HHA had made this communication despite the fact that Ms. Miniex was not actually working and was confined to her bedroom at home.  HHA's false representation to Colonial Life led to the termination of Ms. Miniex's short-term disability benefits and left her without any income at all.

16.    After determining the reason why her short-term disability benefits had been terminated, Ms. Miniex promptly contacted Defendant Gunsolley in an effort to remediate the harmful denial of further short-term disability benefits and apparent abrogation of her FMLA-approved rights.  Gunsolley admitted HHA's improper actions, namely HHA's false work status reports to Colonial Life, but he subsequently failed to rectify the damage caused by HHA's

misrepresentations.  Instead of resolving the issue with Colonial Life, or taking any action to do so, Gunsolley provided Ms. Miniex with only one option for her to obtain a necessary income: work from home on a *"reduced work schedule"* of twenty hours a week.  Needing the income, Ms. Miniex was left with no choice but to work this *"reduced work schedule"* from the confines of her bedroom until she was released to work.  Ms. Miniex was cleared by her orthopedic surgeon to return to the office on or about May 10, 2016.  However, in response to Ms. Miniex's protected FMLA leave, she would be subjected to retaliation in the months to come.  Moreover, HHA was already penalizing Ms. Miniex for her protected leave, as Gunsolley had inscribed *"Unscheduled Absence"* on her FMLA paperwork.  The penalties for Ms. Miniex's protected FMLA leave would continue.

17.    In addition to Gunsolley's improper and unlawful actions regarding Ms. Miniex's protected FMLA leave, Gunsolley took further unlawful actions by accessing Ms. Miniex's FMLA records and her personal and confidential records.  In doing so, without any legitimate basis and outside the course and scope of his employment and HHA's own internal processes, Gunsolley intentionally intruded on the seclusion and personal and private affairs of Ms. Miniex.

18.    In March of 2016, while Ms. Miniex was convalescing at home, bed-bound due to the major injury and surgery, HHA received a fraud tip from an anonymous person through its fraud telephone hotline that an employee of HHA was selling HCVP vouchers for personal profit.  The well-known long waiting list for an HCVP voucher includes thousands of families in need, due to the very limited availability of HCVP vouchers.  As vouchers become available, if at all, applicants from the waiting list are contacted to continue the admissions process, *in the numeric order of applicants*.  The significance of such an allegation of fraud and circumvention of the lawful admissions process was noted by Ms. Miniex and she met with HHA's sole Fraud

Investigator, her direct report, at her home, in her bedroom, to further discuss the case and next steps. After an appropriate investigation by the Fraud Investigator, which was supervised directly by Ms. Miniex, HHA determined that one of its employees was, indeed, selling HCVP vouchers illegally on the black market for personal profit. Based upon the recommendation of Ms. Miniex, HHA then terminated this individual promptly. The illegal conduct and termination were acknowledged publicly by HHA and widely reported in the local news. Per Ms. Miniex's directive, the Fraud Investigator communicated this fraud information to HUD-OIG.

19.     In April of 2016, approximately one month prior to Ms. Miniex's official return to work, a second fraud tip came into HHA's fraud hotline that another employee was also selling vouchers for personal profit. This new tip (and second allegation) was even more alarming because the vouchers allegedly being sold illegally were HUD-VASH vouchers, reserved exclusively for homeless, eligible, VA-referred veterans. This fraud tip was passed on to Ms. Miniex by the Fraud Investigator. Because HHA had received numerous public accolades from local, state, and federal entities and additional funding for its administration of the VASH voucher program, Ms. Miniex promptly communicated to Defendant Gunsolley in April 2016 that this new allegation existed, that she directed the Fraud Investigator to investigate it, and would advise him of the investigation results. In May of 2016, shortly after Ms. Miniex physically returned to the office, she followed-up with the Fraud Investigator to discuss the status of the investigation and instructed him to make the investigation a priority.

20.     In the first two weeks of June of 2016, the HHA Fraud Investigator completed the voucher fraud investigation, which revealed that one HHA employee had fraudulently issued HUD-VASH vouchers for personal profit to individuals who had not been referred by the VA **_and_** were not even veterans of the U.S. military. As part of the fraud, the HHA employee in

question had falsified government documents.   The Fraud Investigator believed and stated that further investigation would likely lead to the discovery of additional, more pervasive acts of fraud.

21.     Based on the preliminary results of the investigation in May 2016, Ms. Miniex met with Gunsolley to inform him of such.   To Ms. Miniex's utter shock, Gunsolley's initial reaction to news of this substantiated fraud tip about a second employee selling vouchers, particularly HUD-VASH vouchers, was outright dismissive:  "Well, it is not like we don't have more vouchers than veterans anyway."  Ms. Miniex informed Gunsolley that due to the fraud and crimes alleged, she would have to report the matter to HUD-OIG.   Around the end of May and the first half of June 2016, Ms. Miniex contacted the Houston, TX, field office of HUD's Office of Inspector General ("HUD-OIG") to report the fraud that had been discovered.   The HUD-OIG is the law enforcement agency responsible for investigating fraud by housing authorities, including the HHA and its employees.   Since that time, Ms. Miniex has communicated numerous times with the HUD-OIG regarding the violations of law alleged regarding the HHA employee's illegal sale of HUD-VASH vouchers.   Ms. Miniex made Gunsolley aware that she had in fact reported the violations of law to HUD-OIG.   Later, Ms. Miniex continued to uphold her fiduciary duty to her client, HHA, by notifying the Board of the serious VASH voucher allegations and investigation, after her supervisor, Gunsolley, advised her that he did not plan to inform the Board of the serious matter and then intentionally provided misinformation to the Board.

22.     In response to her protected reports of violations of the law by another public employee to HUD-OIG and in addition to her protected FMLA leave, HHA and Gunsolley began a campaign of retaliatory conduct towards Ms. Miniex, enlisting and conspiring with several key actors, including several members of Ms. Miniex's Legal department; recognized leaders of

8

HHA's HCVP department and other mission-critical internal departments that Ms. Miniex had charged with various unlawful conduct during her tenure; and HHA's Board.   Almost immediately after her protected report and Gunsolley's knowledge of such, in addition to her exercise of rights under the FMLA, Ms. Miniex became acutely aware that she was being watched and targeted for increased scrutiny at work.   Among certain direct, explicit, and openly hostile overtures, Gunsolley made several remarks and menacing queries, such as asking Ms. Miniex – a widely respected senior-level executive whose track record of success at HHA was well-established and whose HHA pension would fully vest in less than one year – whether she wanted to be a "team player" and whether she even wanted to remain as an employee at HHA.  She was also asked whether she liked her job and he oddly demanded an apology from Ms. Miniex for her divulgement of fraud and its associated wrongdoing to the legally appropriate entities.   Rather than paying any attention to the details of, or giving due deference to HHA's chief legal officer respecting the reported criminal fraud and its substantiating evidence, HHA and Gunsolley were sending a threatening message to Ms. Miniex that her job was in serious jeopardy.  This message continued to be sent over the following months.

23.     As part of HHA's retaliatory campaign, Ms. Miniex was subjected to a hostile work environment that became increasingly toxic and largely intolerable.   Specifically, Ms. Miniex received increased scrutiny regarding her morning office arrival time, attendance, total hours worked in the office during business hours on any given day (but not including Ms. Miniex's well-known availability and work for HHA before and after regular business hours, as well as on weekends and vacations), departmental functioning and efficacy, frequency and quality of staff social activities, her interactions with her executive peers, requests for PTO for verifiable familial emergencies and medical treatment, and her basic daily tasks, actions, and

routine.   Most troubling to Ms. Miniex were Gunsolley's vindictive efforts to intentionally misdirect her, purposeful evasion of reasonable work project queries, and refusal to furnish materially relevant and germane documents in his physical possession so that Ms. Miniex would consequently be sent on *"wild goose chases"* to handle certain time-sensitive work tasks he assigned to her.   Further, she also endured nearly five (5) months of the Board intentionally concealing and never sharing a contracted outside counsel's supposedly independent investigative report on the "actual fraud" Ms. Miniex's department had already substantiated, as well as an outrageous degree of disrespect, collusion, and insubordination from certain members of her staff, namely her sole Fraud Investigator and two subordinate attorneys.   Based on her direct observations, credible witness information, and the totality of the circumstances, Ms. Miniex reasonably believes such deviations and abdications of duty were the direct outgrowth of Gunsolley's retaliatory machinations.   None of this retaliatory behavior, particularly humiliating contacts with Legal staff and other HHA employees, intentional isolation and marginalization, and the concealment of vital job-related information, had ever occurred prior to Ms. Miniex's protected report.

24.     While Gunsolley mostly attempted to avoid Ms. Miniex, his interactions with Ms. Miniex were generally negative and hostile.   His malicious and retaliatory behavior toward Ms. Miniex culminated on or about September 8, 2016, when Gunsolley gave Ms. Miniex a written *"verbal warning."*   To the detriment of Ms. Miniex, this written *"verbal warning"* was placed in her personnel file.   When Ms. Miniex respectfully asked Gunsolley at that time to substantiate the vague claims he was making against her in the written "verbal warning," he was unable to do so and even backed off their legitimacy, stating cavalierly at one point, *"Well, I didn't say these are facts.  I said they are concerns."*

25.     In response to Gunsolley's *"written verbal warning"*, Ms. Miniex timely submitted a formal grievance to HHA, pursuant to its grievance policy, on September 13, 2016.

26.     On or about November 7, 2016, counsel for Ms. Miniex delivered a demand letter to HHA outlining the retaliatory treatment Ms. Miniex had experienced as well as numerous violations of employment laws committed by HHA.   The violation of employment laws addressed in this demand letter included violations of whistleblower protections, the FMLA, and Title VII discrimination provisions.

27.     In early November of 2016, HHA informed Ms. Miniex that it had engaged a purported "independent third-party" investigator to investigate Ms. Miniex's grievance and claims.   However, this investigator was neither independent nor autonomous; he had a long-standing relationship with, and the entirety of his purported investigation was guided and orchestrated by, HHA's hired outside legal counsel handling Ms. Miniex's matter.   *A grievance hearing was never held.*

28.     On or about November 29, 2016, Ms. Miniex was suddenly placed on "paid administrative leave" during an impromptu meeting called by Gunsolley.   After peppering Ms. Miniex with argumentative questions (about subject matter that formed the basis of Ms. Miniex's grievance which purportedly was being investigated by a third-party, independent investigator) and again attacking elements of Ms. Miniex's performance during this meeting, Gunsolley told Ms. Miniex that she was placed on paid administrative leave so he could think about her responses.   He specifically told her that it was not a suspension and that it was not a disciplinary action.  Almost immediately thereafter, Ms. Miniex's access to her email account was disabled.

29.     On or about December 8, 2016, HHA delivered to Ms. Miniex's home, a letter, *taped to Ms. Miniex's front door*, purportedly authored and signed by LaRence Snowden,

President of HHA's Board, summarily rejecting her grievance that had been presented almost a full three months earlier.  The Board's overwhelming untimeliness, coupled with multiple disturbing missteps and dilatory tactics, violated HHA's Employee Handbook policy relating to the proper handling and resolution of employee grievances.  Notably, during that "three-month limbo" *(i.e., September-December 2016)* of palpable uncertainty and inaction – *typified by Gunsolley's continued open expression of personal animus towards Ms. Miniex* – and the persistence of an awkward work environment, the Board blatantly failed to timely and properly act in this time-sensitive matter, except to agree to Ms. Miniex's written request that HHA's Human Resources Director be present for any one-on-one meetings held between Gunsolley and Ms. Miniex during the pendency of the grievance hearing and decision.  On that same day of December 8, 2016, HHA's outside employment counsel sent Ms. Miniex's counsel a letter, which, *inter alia*, summarily rejected her September 2016 grievance; incoherently rejected the November 2016 demand letter from her counsel; offered a very meager and paltry settlement amount in exchange for a full release and an agreement to assist HHA with pending legal cases; and explicitly conveyed the termination of her employment *(with a no-rehire clause)*.

30.   On December 9, 2016, HHA delivered another letter to Ms. Miniex, from Gunsolley, terminating her employment with an effective date of December 12, 2016.  It is also noteworthy that Ms. Miniex had never been allowed to return to work after her impromptu meeting with Defendant Gunsolley on November 29, 2016, which concluded with an ambiguous, pretext-laden instruction that she was placed on "non-disciplinary paid leave" – *not any progressive disciplinary action or suspension without pay*.  Following her FMLA leave, reports of violations of law to the HUD-OIG, and other protected activity, Ms. Miniex quickly went from a heralded, four-year-tenured HHA employee without any disciplinary actions whatsoever

12

to (1) a written verbal warning; (2) paid administrative leave; and (3) termination.  All of these flagrantly adverse employment actions were taken without merit and in direct contravention of HHA's time-honored, well-documented progressive disciplinary policy.

31.     Ms. Miniex brings this lawsuit to redress unlawful retaliation, her unlawful suspension, and her unlawful termination.  She also brings this lawsuit to redress the unlawful actions taken by Gunsolley in invading her privacy.

**V.**
**CAUSES OF ACTION AND DAMAGES**

**Violations of the FMLA**

32.     Plaintiff adopts and incorporates herein by reference all preceding paragraphs.

33.     Defendant HHA's conduct constitutes unlawful interference and retaliation under the Family & Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA").  Specifically, Defendant HHA interfered with, restrained, and otherwise denied the exercise of or the attempt to exercise Plaintiff's FMLA rights, in violation of the FMLA.  29 U.S.C. § 2615(a)(1).  Defendant HHA also discriminated against and discharged Plaintiff for exercising her FMLA rights and opposing practices made unlawful by the FMLA, in violation of the FMLA.  29 U.S.C. § 2615(a)(2).  Lastly, Defendant HHA discriminated against and discharged Plaintiff for filing a charge under the FMLA, in violation of the FMLA.  29 U.S.C. § 2615(b)(1).

34.     As a result of Defendant HHA's conduct, Plaintiff seeks relief which includes, but is not limited to:  (1) wages, salary, employment benefits, and other compensation denied to or lost by Plaintiff by reason of Defendant HHA's FMLA violations; (2) reinstatement to Plaintiff's former position, or if reinstatement is not feasible, front pay; (3) reinstatement of fringe benefits and seniority rights lost because of the termination; (4) liquidated damages; (5) damages for any

13

tax penalties incurred for receiving wages pursuant to a lump-sum award; (6) pre-judgment and post-judgment interest as allowed by law; (7) reasonable attorneys' fees, court costs, and expert witness fees; (8) a declaration that Defendant HHA has violated the FMLA; and (9) such other relief, legal or equitable, as may be warranted or to which Plaintiff is entitled.

**Retaliation Under the False Claims Act**

35.     Plaintiff adopts and incorporates herein by reference all preceding paragraphs.

36.     Defendant HHA's conduct constitutes unlawful retaliation under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*  Defendant HHA discharged, suspended, threatened, harassed, and otherwise discriminated against Plaintiff, in violation of the FCA, for her efforts to stop one or more violations of the FCA.  31 U.S.C. § 3730(h).  Specifically, Defendant HHA retaliated against Plaintiff for her efforts to stop (1) the creation and use of false records and statements material to a false claim; (2) the presentation of fraudulent claims for payment or approval; and (3) a conspiracy to submit false claims to the federal government.

37.     As a result of Defendant HHA's conduct, Plaintiff seeks relief which includes, but is not limited to:  (1) two times the amount of back pay; (2) reinstatement to Plaintiff's former position with the same seniority status that Plaintiff would have had but for Defendant's illegal actions, or if reinstatement is not feasible, front pay; (3) compensation for special damages sustained as a result of Defendant HHA's illegal actions, including compensatory damages in the past and in the future, which include, but are not limited to, damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, (4) damages for any tax penalties incurred for receiving wages pursuant to a lump-sum award; (5) pre-judgment and post-judgment interest as allowed by law; (6) reasonable attorneys' fees, court costs, and expert witness fees; (7) a declaration that Defendant

14

HHA has violated the FCA; and (8) such other relief, legal or equitable, as may be warranted or to which Plaintiff is entitled.

## Violations of the Texas Whistleblower Act

38.     Plaintiff adopts and incorporates herein by reference all preceding paragraphs.

39.     Defendant HHA has violated the Texas Whistleblower Act, TEX. GOV'T CODE § 554.001 *et seq.*  Defendant HHA suspended Plaintiff's employment, terminated Plaintiff's employment, and took other adverse personnel actions against the Plaintiff for her good faith reports of violations of law of another public employee to an appropriate law enforcement authority.  TEX. GOV'T CODE § 554.002.  Specifically, Plaintiff, as a public employee, reported to the Houston field office of the HUD-OIG that an employee of HHA had engaged in fraud.  This fraud reported included, but was not limited to, the falsification of government documents and the illegal sale of HUD Veterans Affairs Supportive Housing (HUD-VASH) vouchers for personal profit.  Such fraud constitutes violations of federal and state criminal law, including but not limited to, bribery (TEX. PENAL CODE § 36.02), tampering with a governmental record (TEX. PENAL CODE § 36.02), accepting a bribe in programs receiving federal funds (18 U.S.C. § 666(a)(1)(B)), and submitting false documents to HUD (18 U.S.C. § 1001).

40.     Plaintiff is the originator-whistleblower, being the HHA employee to report these violations of law related to veterans' vouchers.  Additionally, during her convalescence, she instructed her direct report, the Fraud Investigator, to inform the proper governmental and legal authorities about the initial allegation regarding regular vouchers.  Ms. Miniex reported substantiated fraud to an appropriate law enforcement authority, namely HUD-OIG, because she believed in good faith that HUD-OIG is authorized to (1) regulate under or enforce the laws alleged to be violated in her report, and (2) investigate a violation of criminal law in this context.

15

HUD-OIG is vested with law enforcement authority pursuant to Section 6(e)(3) of the Inspector General Act of 1978, as amended, 5 U.S.C. Appendix.  HUD-OIG is tasked with the prevention and detection of waste, fraud, and abuse in HUD programs.  HUD-OIG conducts criminal, civil, and administrative investigations.  HUD-OIG has the authority to and regularly investigates and enforces the types of violations of laws reported by Ms. Miniex to HUD-OIG.  Upon Ms. Miniex's "whistleblowing" report of violations of law, HUD-OIG began an investigation into such violations.

41.     Plaintiff initiated action under the grievance and appeal procedures of HHA.  Her initiation of action under the grievance and appeal procedures of the HHA following her termination was rebuffed by Defendant HHA on the ground that no grievance or appeal procedures exist for terminated employees.

42.     Plaintiff is entitled to recover reasonable attorney's fees and court costs for bringing this action.  TEX. GOV'T CODE § 554.003.

43.     As a result of Defendant HHA's conduct, Plaintiff seeks relief which includes, but is not limited to:  (1) back pay; (2) reinstatement to Plaintiff's former position, or if reinstatement is not feasible, front pay; (3) lost benefits in the past and the future; (4) reinstatement of fringe benefits and seniority rights lost because of the termination; (5) compensatory damages in the past and in the future, including, but not limited to, damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, as allowed by law; (6) damages for any tax penalties incurred for receiving wages pursuant to a lump-sum award; (7) pre-judgment and post-judgment interest as allowed by law; (8) reasonable attorneys' fees, court costs, and expert witness fees; (9) a declaration that Defendant HHA has violated the Texas Whistleblower Act; and (10) such other relief, legal or

equitable, as may be warranted or to which Plaintiff is entitled.

## **Invasion of Privacy by Defendant Gunsolley, Individually**

44.     Defendant Gunsolley intentionally intruded on the Plaintiff's private affairs by accessing Plaintiff's FMLA records and her highly personal and private medical information. This intrusion is highly offensive to any reasonable person and was unreasonable, unjustified, and unwarranted.   Gunsolley's intrusion was committed with malice, out of pure personal animosity, and outside the course and scope of his employment.  Plaintiff suffered an injury as a result of Defendant Gunsolley's intentional intrusion.

45.     As a result of Defendant Gunsolley's conduct, Plaintiff seeks relief which includes, but is not limited to:  (1) actual damages, including damages for mental anguish, emotional pain and suffering, and loss of enjoyment of life; (2) nominal damages; (3) punitive damages; (4) pre-judgment and post-judgment interest as allowed by law; (5) court costs; and (6) such other relief, legal or equitable, as may be warranted or to which Plaintiff is entitled.

## **Violations of Title VII of the Civil Rights Act of 1964 and Chapter 21 of the Texas Labor Code**

46.     Plaintiff intends to later seek leave of Court to bring claims in this lawsuit for employment discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964 and Chapter 21 of the Texas Labor Code.  She will seek leave to amend this Complaint to add these claims after the Texas Workforce Commission and Equal Employment Opportunity Commission have had time to investigate her claims.

## **VI.**
## **JURY DEMAND**

47.     Plaintiff requests a trial by jury on issues triable by a jury in this case.

# VII.
# PRAYER

48.     Plaintiff demands judgment in her favor and requests the following relief against Defendant HHA for violations of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*:

      a.     Wages, salary, employment benefits, and other compensation denied to or lost by Plaintiff by reason of Defendant HHA's FMLA violations;

      b.     Reinstatement, or, if the Court determines that reinstatement is not feasible or is impossible, front pay and vesting of her HHA pension benefits;

      c.     Reinstatement of fringe benefits and seniority rights lost because of Plaintiff's unlawful termination;

      d.     Liquidated damages as provided by 29 U.S.C. § 2617(a)(1)(A)(iii);

      e.     Damages for any tax penalties incurred for receiving wages pursuant to a lump-sum award;

      f.     Attorneys' fees both for this cause, and for any and all appeals as may be necessary;

      g.     Pre-judgment and post-judgment interest as allowed by law;

      h.     Costs of court and other costs of prosecuting Plaintiff's claims;

      i.     Expert witness fees;

      j.     A declaration that Defendant HHA has violated the FMLA; and

      k.     Such other relief, legal or equitable, as may be warranted or to which Plaintiff is entitled.

49.     Plaintiff demands judgment in her favor and requests the following relief against Defendant HHA for violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.*:

a.    Two times the amount of back pay;

b.    Reinstatement to Plaintiff's former position with the same status that Plaintiff would have had but for Defendant HHA's illegal actions, or, if the Court determines that reinstatement is not feasible or is impossible, front pay and vesting of her HHA pension benefits;

c.    Compensation for special damages sustained as a result of Defendant HHA's illegal actions, including compensatory damages in the past and in the future, which include, but are not limited to, damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

d.    Damages for any tax penalties incurred for receiving wages pursuant to a lump-sum award;

e.    Attorneys' fees both for this cause, and for any and all appeals as may be necessary;

f.    Pre-judgment and post-judgment interest as allowed by law;

g.    Costs of court and other costs of prosecuting Plaintiff's claims;

h.    Expert witness fees

i.    A declaration that Defendant HHA has violated the FCA; and

j.    Such other relief, legal or equitable, as may be warranted or to which Plaintiff is entitled.

50.    Plaintiff demands judgment in her favor and requests the following relief against Defendant HHA for violations of the Texas Whistleblower Act, TEX. GOV'T CODE § 554.001 *et seq.*:

a.  Actual damages for the period of time provided by law, including backpay;

b.  Reinstatement, or, if the Court determines that reinstatement is not feasible or is impossible, front pay and vesting of her HHA pension benefits;

c.  Lost benefits in the past and future;

d.  Reinstatement of fringe benefits and seniority rights lost because of the termination;

e.  Compensatory damages (past and future), including, but not limited to, damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, as allowed by law;

f.  Damages for any tax penalties incurred for receiving wages pursuant to a lump-sum award;

g.  Attorneys' fees both for this cause, and for any and all appeals as may be necessary;

h.  Pre-judgment and post-judgment interest as allowed by law;

i.  Costs of court and other costs of prosecuting Plaintiff's claims;

j.  Expert witness fees;

k.  A declaration that Defendant HHA has violated the Texas Whistleblower Act; and

l.  Such other relief, legal or equitable, as may be warranted or to which Plaintiff is entitled.

51.  Plaintiff demands judgment in her favor and requests the following relief against

Defendant Gunsolley for invasion of privacy:

a.    Actual damages, including damages for mental anguish, emotional pain and suffering, and loss of enjoyment of life;

b.    Nominal damages;

c.    Punitive damages;

d.    Pre-judgment and post-judgment interest as allowed by law;

e.    Court costs; and

f.    Such other relief, legal or equitable, as may be warranted or to which Plaintiff is entitled.

Respectfully Submitted,

By:    /s/ R. Scott Cook
_____
Russell Scott Cook, Attorney-in-Charge
State Bar No. 24040724
Southern District Bar No. 557456
The Cook Law Firm, Of Counsel
919 Congress Avenue, Suite 1145
Austin, Texas 78701
Telephone:  (512) 482-9556
Telecopier:  (512) 597-3172
PLAINTIFF'S ATTORNEY-IN-CHARGE

OF COUNSEL:

**(*Pro Hac Vice application forthcoming*)**
**Smithers Thornton & Ume-Nwagbo, LLC**
**Edith S. Thornton, Esquire**
**Georgia Bar No.  710327**
**est@stulawgroup.com**
**2451 Cumberland Pkwy, SE, Suite 3836**
**Atlanta, GA  30339**
**Phone:  (404) 418-8492**
**Fax:  (404) 736-6063**
ATTORNEY FOR PLAINTIFF