IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KAREN MINIEX, | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:17-CV-00624 |
| | § | |
| | § | |
| HOUSTON HOUSING AUTHORITY, | § | |
| Defendant. | § | |
| | § | JURY TRIAL DEMANDED |
| | § | |
| | § | |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGEMENT
### &
### MOTION TO STRIKE IMPROPER AFFIRMATIVE DEFENSES

## TABLE OF CONTENTS

I.     BACKGROUND ...................................................................................1

    A.    Houston Housing Authority.............................................................1

    B.    Housing Choice Voucher Program ..................................................1

    C.    Tory Gunsolley becomes HHA CEO................................................2

    D.    Karen Miniex is hired as HHA General Counsel..............................2

    E.    April 2016: Fraud in the VASH Program .........................................3

    F.    Ms. Miniex's preliminary/first fraud report is trivialized ......................3

    G.    Ms. Miniex's second fraud report is trivialized ...................................4

    H.    Ms. Miniex's third fraud report is trivialized.......................................5

    I.    June 21, 2016: Karen Miniex Reports Fraud after HHA CEO Tory Gunsolley Misleads the Board ...............................................6

    J.    June 23, 2016: Tory Gunsolley Asks to Terminate Ms. Miniex............................7

    K.    June 2016 to August 2016: Gunsolley's Retaliates Against Ms. Miniex in lieu of Termination ..............................................7

    L.    August 2016: HHA Board Launches Fraud investigation & Puts Gunsolley's Contract Renewal on hold ...............................8

    M.    September 2, 2016: Two Lawyers that Ms. Miniex Supervises Report "Concerns" about Ms. Miniex's Attendance to their Friend Gunsolley.................9

    N.    September 7, 2016: Gunsolley Reprimands Ms. Miniex for her Attendance ........11

    O.    September 13, 2016: Ms. Miniex Files a Grievance................................13

    P.    October 2016: David Bryce, Jamie Reaves, and HHA's Outside Employment Counsel Kevin Troutman Draft Gunsolley's Response to Ms. Miniex's Grievance..............................13

    Q.    November 2, 2016: Troutman gives Gunsolley a Playbook for Terminating Ms. Miniex......................................14

    R.    November 15, 2016: Grievance Hearing Cancelled; Instead, Board asks

Troutman to hire a So-Called Neutral Investigator...................................14

S.     November 29, 2016: Ms. Miniex Sent Home for Disagreeing with
       Gunsolley's September 8 Verbal Warning ..........................................14

T.     December 9, 2016: Ms. Miniex is Terminated from HHA for Disagreeing
       with Gunsolley's September 8 Verbal Warning ...................................16

II.   APPLICABLE LAW ...................................................................................17

A.     Summary Judgement Standard .............................................................17

B.     Federal Rule Procedure 12(f) ...............................................................17

III.   ARGUMENT ...............................................................................................18

A.     HHA has no evidence that Ms. Miniex failed to mitigate her damages ...............18

       1.     HHA cannot prove that Ms. Miniex has withdrawn from the
              employment market entirely; the evidence proves that Ms. Miniex
              has applied for more than 100 positions and has only obtained a
              temporary document review position..........................................18

       2.     HHA has presented no evidence that there were substantially
              equivalent positions to HHA General Counsel...........................19

       3.     HHA has presented no evidence that Ms Miniex failed to use
              reasonable diligence to obtain any position ..............................20

       4.     HHA's defenses that are duplicative of mitigation should be
              stricken .....................................................................................20

B.     The at-will employment doctrine is not a defense to Ms. Miniex's
       retaliation claims ..................................................................................20

C.     Ms. Miniex's claims were timely filed; statute of limitations is not a
       proper defense ......................................................................................21

D.     HHA has no evidence that Ms. Miniex had a pre-existing conditions that
       would limit her entitlement to mental anguish, emotional pain, and other
       non-pecuniary losses. ...........................................................................21

E.     HHA's "laundry list" of affirmative defenses should be stricken for
       failing to meet the requirements of Federal Rule of Civil Procedure 8 ................22

F.     HHA's "after-acquired evidence" defense should be dismissed ..........................23

G.     HHA's laches affirmative defense should be dismissed.......................................23

H.      HHA's waiver affirmative defense should be dismissed ........................................23

I.      HHA's estoppel affirmative defense should be stricken or, in the alternative, dismissed ............................................................................................24

J.      HHA's unclean hands affirmative defense should be dismissed ..........................24

TABLE OF AUTHORITIES

**Cases**

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544, 548 (2007)........................................................................................... 23

*Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*,
   482 F.3d 408, 411 (5th Cir. 2007) .......................................................................... 17

*Caldwell v. Barnes*,
   975 S.W.2d 535, 538 (Tex. 1998)............................................................................ 24

*Federal Express Corp. v. Dutschmann*,
   846 S.W.2d 282, 283 (Tex. 1993)............................................................................ 21

*Ford Motor Co. v. E. E. O. C.*,
   458 U.S. 219, 232 (1982)........................................................................................... 20

*Greater Houston Small Taxicab Co. Owners Ass'n v. City of Houston*,
   660 F.3d 235, 238 (5th Cir. 2011) .......................................................................... 17

In re Beef Indus. Antitrust Litig.,
   600 F.2d 1148, 1168 (5th Cir.1979) ...................................................................... 18

*Jefferies v. Harris Co. Community Action Ass'n*,
   615 F.2d 1025, 1036 (5th Cir. 1980) ...................................................................... 21

*McKennon v. Nashville Banner Pub. Co.*,
   513 U.S. 352, 360 (1995)........................................................................................... 24

*Moore v. Neff*,
   629 S.W.2d 827, 828–29 (Tex. App. 1982)............................................................ 25

*Munzenrieder & Assocs., Inc. v. Dalgle*,
   525 S.W.2d 288, 291 (Tex. App. 1975)................................................................... 25

*N.L.R.B. v. Laredo Packing Co.*,
   730 F.2d 405, 407 (5th Cir. 1984) .......................................................................... 18

*Pulaski Bank and Trust Co. v. Texas American Bank/Fort Worth, N.A.*,
   759 S.W.2d 723, 735................................................................................................... 21

*Schroeder v. Texas Iron Works, Inc.*,
   813 S.W.2d 483, 489 (Tex. 1991)............................................................................ 25

*Sun Exp. &. Prod. Co. v. Benton*,

iv

728 S. W. 2d 35, 37 (Tex. 1987) .......................................................................... 25

United States v. Renda,
709 F.3d 472, 479 (5th Cir.2013) .................................................................... 18

*United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.,*
414 F.3d 558, 567 (5th Cir. 2005) .................................................................. 26

*Woodfield v. Bowman*,
193 F.3d 354, 362 (5th Cir. 1999) ................................................................. 23

**Rules**

29 U.S.C. § 2615(a)(2) .......................................................................................... 22

29 U.S.C. § 2617(c)(1)-(2) .................................................................................... 22

31 U.S.C. § 3729(h) .............................................................................................. 22

31 U.S.C. § 3730(h)(2) .......................................................................................... 22

FED. R. CIV. P. 12(f) ............................................................................................. 18

FED. R. CIV. P. 56.................................................................................................. 17

Plaintiff Karen Miniex files this Motion for Partial Summary Judgment and Motion to Strike Improper Affirmative Defenses against Defendant Houston Housing Authority (HHA) and would respectfully show the Court as follows:

I.        BACKGROUND

A.        Houston Housing Authority.

HHA is one of the nation's largest public housing authorities. Exhibit A at 1.   The housing authority employs almost 200 employees and provides affordable housing and related serves to more than 60,000 Houstonians.   *Id.* at 5.   HHA's total budget for fiscal year 2018 is approximately  $189  million.   *See, e.g.,* Exhibit B at 8.   However, HHA receives most of its funding from the federal government, including from the United States Department of Housing and Urban Development ("HUD") and the Department of Veterans' Affairs (VA).   Because of the considerable number of individuals that HHA serves, it receives substantial funding from HUD and the VA—approximately $140 million—and is subject to numerous, comprehensive federal regulations.   *See, e.g.,* Exhibit B at 7.   The primary purpose of these regulations is to ensure that HHA properly manages and spends the significant amount of tax payer money it receives and that there is appropriate oversight from HHA executives and Board of Commissioners.

B.        Housing Choice Voucher Program

The Housing Choice Voucher Program (HCVP)—administered by a department of the same name within HHA—administers the "Section 8" Program, which provides housing assistance to all low-income Houston residents. Historically, HHA's waiting list is long.   For example, 30,000 people are on the waitlist for Section 8 tenant-based assistance.   Exhibit B at 70. It may take years before an applicant obtains the much-needed housing assistance.   For fiscal

1

year 2018, Section 8 alone will receive more than $130 million from the federal government. Exhibit B at 7.

By contrast, the Veterans' Affairs Supportive Housing (VASH) program, which is also part of HCVP and provides affordable housing to homeless veterans, has been greatly lauded. The VASH program has been recognized in national media and by members of then-President Barack Obama's Cabinet and then-Mayor Annise Parker for effectively addressing homelessness in Houston, particularly veteran homelessness.

C.     Tory Gunsolley becomes HHA CEO.

In 2011, Tory Gunsolley became HHA's President and CEO. After being "second in command" for most of his career at various small-to-medium size housing authorities, HHA was Gunsolley's opportunity to lead his own organization. Exhibit C (Dep. of T. Gunsolley 9:11-9:15; 10:1-10:7).

D.     Karen Miniex is hired as HHA General Counsel.

In 2012, Gunsolley hired Karen Miniex to serve as HHA Vice President and General Counsel. Ms. Miniex is a graduate of the University of Michigan Law School, where she served as an editor on two law journals. Exhibit A at 3.  At the start of her career, Ms. Miniex received the prestigious Equal Justice Works Fellowship to work in low-income communities, addressing housing and other related poverty issues. *Id.* at 2.  She continued that work for approximately 4 years before opening her own private practice that focused on real-estate and construction litigation, as well as elder and consumer law.  According to Gunsolley, because of Ms. Miniex's skill set, she was ideal for HHA and became a stellar employee and General Counsel. Exhibit C at 27:23-36:20.

Every year, Ms. Miniex received a raise, outstanding performance reviews, and as a result of her good work, additional responsibilities. *Id.* at 36:8-38:10.  Indeed, a year after Ms.

2

Miniex arrived at HHA, Gunsolley asked her to lead the HHA Procurement Department, in addition to her responsibilities as Chief Legal Officer. Exhibit D (Dep. of K. Miniex at 10:22-25). The Procurement Department had no staff, except for a mail clerk, and had previously experienced substantial administrative malfunctioning. *Id.*  Ms. Miniex was tasked with restructuring and repairing the department. *Id.* at 10:25-11:12.   After successfully leading the Legal Department and Procurement Department, Ms. Miniex voluntarily assumed, with Gunsolley's approval, leadership of other tasks at HHA.  Exhibit A at 1, 2; Exhibit D (Dep. of K. Miniex at 10:19-21).  Ms. Miniex was also recognized in the media for her successful tenure at HHA.  Exhibit A at 5.  Ms. Miniex's status as an exemplary employee changed abruptly after she refused to allow Tory Gunsolley to conceal ongoing fraud in the VASH program.

E.      April 2016: Fraud in the VASH Program.

In April 2016, Ms. Miniex learned that at least one employee in HHA's HCVP Department was illegally selling VASH housing vouchers.  This was the second instance of fraud during a five-month period within the HCVP Department. A few months earlier, an HCVP employee was terminated, upon Ms. Miniex's recommendation, and subsequently prosecuted by the Harris County District Attorney's Office for selling Section 8 housing vouchers. Exhibit E. As was her job, Ms. Miniex reported the results of both investigations.  However, unlike the Section 8 fraud, he would not take swift action with the VASH fraud and misrepresented Ms. Miniex's investigation to the HHA Board.  So, Ms. Miniex stepped outside of her job duties and reported directly to the Board to explain her concerns about ongoing fraud in the HCVP program.

F.      Ms. Miniex's preliminary/first fraud report is trivialized.

Based on the preliminary results of her VASH fraud investigation in May 2016, Ms.

Miniex met with Gunsolley to report the results.  Gunsolley's initial reaction to news of this substantiated fraud tip about a second employee selling vouchers, particularly VASH vouchers, was outright dismissive:  *"Well, it is not like we don't have more vouchers than veterans anyway."*  Exhibit D (Dep. of K. Miniex at 55:19-20).  Gunsolley later told HHA counsel from Clark Hill Strasburger & Price something to that effect regarding his lack of concern about the VASH fraud.  Exhibit F (Dep. of K. Anderson at 58:14-18).

During the meeting about the preliminary results of the fraud investigation, Ms. Miniex informed Gunsolley that due to the fraud and crimes alleged, she would have to report the matter to the HUD Office of Inspector General.  *See, e.g,* Exhibit D (Dep. of K. Miniex at 81:1-6).  Ms. Miniex also recommended that the employee allegedly committing the fraud be suspended, pending the outcome of the investigation and that the Board be advised of the fraud allegation at the next meeting.  Exhibit D (Dep. of K. Miniex at 55:8-18). Though Gunsolley was hesitant to suspend the employee, Ms. Miniex was persistent and the employee was suspended without pay the next day.

G.      Ms. Miniex's second fraud report is trivialized.

On or about June 14, 2016, Ms. Miniex submitted her second report that was drafted by the Legal Department's fraud investigator Ben Skalka and was the first written report submitted to Gunsolley.  *See* Exhibit G at 1.  Again, Gunsolley was dismissive of what Ms. Miniex reported.  He refused to look at the report exhibits and claimed that the evidence presented was not a "slam dunk."  Exhibit D (Dep. of K. Miniex at 63:20-23).  Ms. Miniex again recommended that the matter and investigation be fully disclosed to the Board.  Ms. Miniex also recommended the termination of Mark Thiele and Robin Wall, the primary managers of the HCVP Department.

Ms. Miniex explained that Thiele and Wall, for some time, had failed to properly

supervise the HCVP Department.  The recommendations were not unfounded; HCVP leadership had a long history of HHA violations and internal complaints.

On numerous occasions, even after being corrected, Thiele and Wall had allowed violations of HHA's Record Retention Schedule (which comports with HUD's required Records Retention Schedule) and Texas Public Information Act requirements; had allowed multiple due process violations in proposed participant voucher terminations; observed employees bullying and mistreating other employees in the department, but still allowed the bullies to supervise others in the HCVP Department; and further, allowed repeated, blatant fraud to occur in the voucher programs that they were tasked with supervising.  Exhibit G at 36.

Also, several grievances had been filed against Walls, and HCVP had (and still does have) a high turnover rate.  Notably, employees complained that Walls retaliated against them, harassed them because of their sexuality and race, threatened them, and generally, failed to properly supervise the more than 50 people under her supervision.  *See, e.g.,* Exhibit H.  In 2013, HHA hired outside counsel to investigate whether HHA was being exposed to liability because of Ms. Wall's conduct.  *Id.*  Although counsel determined that there was no legal exposure, Ms. Miniex continued to have concerns about Walls and her department.  Her concerns were further substantiated when, in 2016, fraud was uncovered in HCVP.   And at one point, a Board member even asked to terminate Walls.  Exhibit I at HHA05596.   Despite Ms. Miniex's report and recommendation, Gunsolley declined to take any remedial action against HCVP leadership.

H.     Ms. Miniex's third fraud report is trivialized.

On June 20, 2016, Ms. Miniex submitted an amended fraud report at Gunsolley's instance.  Exhibit G.  However, there was no need to make substantive changes, not even from an interview with Robin Walls that Gunsolley insisted Ms. Minex ask Mr. Skalka to conduct,

Exhibit J, and that was later completed. Exhibit K. The interview also did not change Ms. Miniex's recommendations.

Yet again, Gunsolley was dismissive of what Ms. Miniex reported and refused to look at the report and exhibits. Instead, Gunsolley told Ms. Miniex she should "consider whether she wanted to be at HHA" and that, lately, she was not being a "team player." He also asked if Ms. Miniex liked her job. Exhibit D (Dep. of K. Miniex at 46:26-48:20). He told her that he was only going to vaguely tell the Board in his "Personnel Update" that he planned to terminate someone for policy violations. Exhibit D (Dep. of K. Miniex at 58:15-23).

Ms. Miniex was concerned that the Board would never know that fraud was ongoing. HHA Investigator Skalka indicated that more investigation needed to be done to rule out continuing fraud. Exhibit D (Dep. of K. Miniex at 209:22-210:8). However, Mr. Skalka was told by Gunsolley something to the effect of to "wrap up" the Newland investigation quickly, Exhibit K (Dep. of B. Skalka at 246:16-23), and Mr. Skalka grew concerned about losing his job if he continued to investigate, Exhibit L at MIN 1060. So, although Skalka had confirmed that VASH vouchers had been sold fraudulently; Gunsolley made him feel as though he could not do any investigation into whether others, including HCVP leadership, were involved in the fraud.

I.    June 21, 2016: Karen Miniex Reports Fraud after HHA CEO Tory Gunsolley Misleads the Board.

Subsequently, at the June 21, 2016 Board meeting, Gunsolley intentionally provided the Board misleading and incomplete information about the VASH fraud. Though the initial VASH fraud investigation was completed, several instances of fraud had been confirmed, and Ms. Miniex and Mr. Skalka still had concerns about pervasive fraud, Gunsolley told the Board that the VASH fraud was "hot off the press. We just got this. I just learned about it." Exhibit D (Dep. of K. Miniex at 68:16-17). He also framed the discussion as though the VA had done something

wrong; a notion that had been squarely refuted by Ms. Miniex and Mr. Skalka's investigation. *Id.* at 18-21. When Gunsolley was pushed on the matter by the Board members, he told them that his contract makes him responsible for all personnel matters, not the Board, and that HCVP was going to get an investigation started into fraud within its department. *Id.* at 69:1-15; Exhibit L at MIN1064.  The Board was troubled by the idea that HCVP, not an independent third party, would investigate potential ongoing fraud occurring in HCVP.  Exhibit D (Dep. of K. Miniex at 69:1-15)

After hearing Gunsolley's report, Ms. Miniex went outside HHA's "chain of command" and, that night, reported the fraud and her concerns accurately, directly to the Board's Vice Chair LaRence Snowden. Exhibit L at MIN1063.  Snowden response: "[Gunsolley] knows that I am on to something and I'm not stopping until I get to the bottom."  *Id.*  The next day Ms. Miniex reported the fraud to other Board members. Almost immediately after Ms. Miniex reported her concerns about ongoing fraud to the Board, Gunsolley began retaliating against her.

J.    June 23, 2016: Tory Gunsolley Asks to Terminate Ms. Miniex.

The day after Ms. Miniex reported the VASH fraud to the HHA Board, Gunsolley decided to terminate Ms. Miniex. Exhibit D (Dep. of K. Miniex at 47:21-48:9).  However, after discussing the matter with Board Chairman Lance Gilliam, Gunsolley was not permitted to do so.  *Id.*  Because Gunsolley could not justifiably terminate Ms. Miniex, he began to retaliate against her. Gunsolley wanted to punish Ms. Miniex for going to the Board about the VASH fraud and, ultimately, force her to quit.

K.    June 2016 to August 2016: Gunsolley's Retaliates Against Ms. Miniex in lieu of Termination.

Gunsolley again pressured Ms. Miniex to "consider whether she wanted to be at HHA" and that, lately, she was not being a "team player."  Exhibit D (Dep. of K. Miniex at 46:26-

48:20).   He also asked Ms. Miniex again if she liked her job and whether she wanted to remain an employee at HHA. Gunsolley also demanded an apology from Ms. Miniex for divulging the fraud and its associated wrongdoing to HUD and to the Board. Exhibit I; Exhibit M.   Despite Gunsolley's efforts to force her to quit, Ms. Miniex did not resign. She continued to bring attention to the VASH fraud and discuss her report and recommendations with various members of the HHA Board.

L.     <u>August 2016: HHA Board Launches Fraud investigation & Puts Gunsolley's Contract Renewal on hold.</u>

One of the recommendations that Ms. Miniex made in her VASH fraud report was that HHA hire an outside investigator to evaluate whether there was fraud in the HCVP department. Exhibit G at HHA007479.  Despite Gunsolley's efforts to minimize that fraud, the HHA Board agreed with Ms. Miniex's recommendation and engaged someone to look into the VASH fraud at the end of July 2016.  Exhibit N.

Soon after, on August 3, 2016, Gunsolley sent the Board a memo requesting that his contract renewal be fast tracked from April 2017 to August 2016. Exhibit O. The next day, the VASH fraud investigation began, which was conducted by counsel from Clark Hill Strasburger & Price.  *See* Exhibit I.  Also (or the day after that), the HHA Board voted to postpone the renewal of Gunsolley's contract and discussed implementing yearly evaluations for the CEO. Exhibit O. During the same Board meeting, Lance Gilliam—one of Gunsolley's allies—resigned and LaRence Snowden was voted in as Board Chair. Since the June 21 Board meeting, Snowden had been sending Ms. Miniex text messages encouraging her to continue her efforts to uncover fraud and document all of her conversations. Exhibit L at MIN1065. As a result, Ms. Miniex trusted Snowden, and immediately after she reported the suspected ongoing fraud to the Board, she frequently called Snowden, met with him in person, and sent him text messages. She

requested help, discussed issues occurring at HHA, and explained that she felt unconformable

working for Gunsolley and was afraid he would retaliate against her and/or terminate her.  *See,*

*e.g., id.* at MIN1065-66; MIN1068; *see generally* Exhibit L.

M.   September 2, 2016: Two Lawyers that Ms. Miniex Supervises Report "Concerns" about Ms. Miniex's Attendance to their Friend Gunsolley.

Around the time that the HCVP fraud investigation was taking place and the Board was

reviewing Gunsolley's contract, Gunsolley asked his assistant to pull Ms. Miniex's paid time off

(PTO records), leave forms, and emails regarding attendance. Exhibits P, Q at MIN1082.

Gunsolley hastily attempted to create a paper trail that would justify terminating Ms. Miniex for

violating HHA's attendance policy.  He was so anxious to "tally up" the necessary number of

attendance violations, he even counted the times when Ms. Miniex asked to be absent because

her infant son was ill—Ms. Miniex is a single parent—(Exhibit P at HHA007259), when she was

working from home (*id.* at HHA007113), and when there was flooding in Houston and she was

unable to drive to work (*id*. at HHA007074). He even counted as an attendance violation when

Ms. Miniex sought Family Medical Leave in January 2016.  Exhibit R.

To give Gunsolley's actions context: HHA's Employee Handbook states that an

employee is tardy if the employee is "10 minutes late." This was changed at some point in 2016

to "15 minutes late." Exhibit S at 50.  After multiple tardies, the employee was to be disciplined

progressively: verbal counseling (5 tardies), written counseling (7 tardies), final warning (9

tardies), and termination (10 tardies). *Id.* at 51.  Likewise, if employees were to be absent and

gave their supervisor less than 12 hours' notice—later changed to less than 24 hours' notice at

some point in 2016—the absence would be considered unscheduled. *Id.* at 52.  HHA employees

would receive progressive discipline for multiple unscheduled absences: verbal reminder (5

unscheduled absences), verbal counseling (6 unscheduled absences), written reprimand (7

unscheduled absences), and termination (8 unscheduled absences). *Id.*

Gunsolley did not have the documentation necessary to prove that Ms. Miniex had 8 unscheduled absences because he *never* enforced HHA's attendance policy with HHA executives, including Ms. Miniex. Moreover, it would be near impossible for Gunsolley to document an executive's attendance; unlike other employees, HHA executives and senior leadership do not have to clock in and out of the office like non-exempt, hourly employees. *See, e.g.,* Exhibit T. *The only way to keep track of an HHA executive's time would be to have that employee watched.* Even then, the record would not be accurate because executives were not always at their desks. They often attended meetings (*e.g.*, with Gunsolley, the HHA Board, or Houston Mayor) or conferences outside the office. Gunsolley simply would not be able to terminate Ms. Miniex for absences using the records in his possession.

There were only three lawyers in HHA's Legal Department: Ms. Miniex and the two lawyers that she supervised, David Bryce and Jamie Reaves. Reaves and Gunsolley had a well-established friendship both in and out of the office. Both were avid hunters and enjoyed going to the shooting range and having lunch together. Reaves and Gunsolley also went on overnight hunting trips together with their children. Exhibit P.

Conveniently, on September 2, 2016, Bryce and Reaves approached Gunsolley about alleged concerns with Ms. Miniex's job performance.  Bryce had been recording Ms. Miniex's attendance—when she arrived, when she left, when she was out of the office—*for more than three years* as insurance just in case Ms. Miniex retaliated against him. Exhibit V.   Bryce and Reaves claimed that Ms. Miniex's attendance had been increasingly poor since May 2016 when she returned from a leave of absence due to a catastrophic ankle injury.  Exhibits W (David Bryce Report), X (Jamie Reeves Report). Bryce and Reaves further claimed that the Legal

Department was underperforming and that Ms. Miniex had a bad attitude. *Id.* An example of Ms. Miniex "failing" to do her job: An employee gave one month's notice before her departure from HHA so that she could take advantage of HHA benefits the month after she left HHA. Exhibits W at HHA2_007785, Exhibit X at HHA2_007794. Ms. Miniex learned that the employee was not doing any work and asked the employee to leave. Bryce and Reeves claimed that this was a violation of HHA policy, which supposedly requires HHA to agree to any notice period once given by an employee. *Id.*

Bryce and Reaves submitted written reports to Gunsolley on September 7, 2016. Attached to Bryce's report were calendars noting Ms. Miniex's arrival time, departure time, and days out of the office from May 2016 to September 2016. Exhibit W at HHA2_007788-93. Gunsolley asked them to continue monitoring Ms. Miniex's attendance.

N.    <u>September 7, 2016: Gunsolley Reprimands Ms. Miniex for her Attendance.</u>

The same day that Bryce and Reaves provided Gunsolley their written reports— September 7, 2016—Gunsolley gave Ms. Miniex a verbal warning based almost entirely on Bryce's and Reaves's allegations. Exhibit Y. Gunsolley claimed that Ms. Miniex needed to improve (1) communication about her schedule, (2) department productivity, and (3) her attitude. *Id*. During Ms. Miniex's meeting with Gunsolley, she asked for specific examples of her alleged misconduct so that she could better understand to what absences or projects he was referring. His response was vague. For example, he named two or three projects that were falling behind, but when Ms. Miniex challenged the examples and suggested that they sit down to discuss the projects after she checked her department staff's work status reports, he responded: "Well, I didn't say these are facts. I said they are concerns." Exhibit Q (Ms. Miniex's notes taken contemporaneously during the September 8 meeting).

Gunsolley's reprimand was shocking to Ms. Miniex because it was primarily being made pursuant to HHA's attendance policy, which Gunsolley did not apply to HHA executives. Gunsolley required executives to notify him if they had a schedule change so that his administrative assistant could keep track of their PTO and generally know their whereabouts. Accordingly, Ms. Miniex's practice was to inform Gunsolley and his assistant every time— mostly via email, sometimes with a call or text message—when she would arrive late, depart early, or be absent. Exhibit Z. Gunsolley expressly approved the change almost every time, and until September 8, he *never* voiced concern or disapproval with Ms. Miniex's schedule changes. Ostensibly, Gunsolley did not take issue with any of Ms. Miniex's schedule changes because he knew that she was always available on her cell phone and often worked at night and on the weekends. Exhibit AA.

Ms. Miniex's September 8 verbal warning was the first and only time that Gunsolley enforced HHA's attendance policy against an HHA executive. Exhibit C (T. Gunsolley Depo. at 50:22-54:7). Gunsolley also admitted that this was the first and only time that he had reprimanded an HHA executive for schedule changes. *Id*. at 51:3-51:5. Ms. Miniex was the first and only HHA executive to have her schedule changes (arrivals, departures, and absences) documented for purposes other than PTO. *Id*. at 54:19-54:24; 74:20-75:9. The verbal warning was documented and placed in Ms. Miniex's file. Exhibit Y.

Because Gunsolley failed to verify David Bryce's calendar, Gunsolley did not realize that Bryce marked Ms. Miniex absent mostly on days that she scheduled to be out of the office in advance and that were approved by Gunsolley. Similarly, most of her late arrivals and early departures were reported to Gunsolley and were approved before they occurred. Exhibit Z. For example, Ms. Miniex was on the Board of her Homeowners Association and on the Board of the

Houston chapter of The General Counsels Forum. *See, e.g,* Exhibit BB.  Gunsolley knew that sometimes she had to arrive late or leave early to attend those board meetings. Bryce did not know about the meetings and marked Ms. Miniex absent on those days. Also, certain early departures were due to Ms. Miniex's offsite meetings. These meetings typically were not disclosed to anyone. In sum, Bryce's calendar, the primary basis for the adverse employment actions against Ms. Miniex, was substantially incorrect:

| Ms. Miniex's Absences, "Late" Arrivals, and "Early" Departures August 2016 – October 2016 *Compare* Exhibits G, P, *with* Exhibit W at HHA2_007788-93 | | | |
|---|---|---|---|
| | David Bryce's Calendar | INCORRECT Entries on Bryce's Calendar | HHA Unable to Provide Relevant Discovery |
| Unscheduled Absences | 28 | 28 | 0 |
| "Late" Arrivals | 43 | 38 | 5 |
| "Early" Departures | 49 | 24 | 25 |

O.  <u>September 13, 2016: Ms. Miniex Files a Grievance.</u>

Ms. Miniex feared that Gunsolley was trying to retaliate against her for reporting the VASH fraud to the Board. Accordingly, she retained counsel and, on September 13, 2016, filed a grievance against Gunsolley with the HHA Board and requested a grievance hearing so that she could tell her side of the story. Exhibit CC.

P.  <u>October 2016: David Bryce, Jamie Reaves, and HHA's Outside Employment Counsel Kevin Troutman Draft Gunsolley's Response to Ms. Miniex's Grievance.</u>

During October 2016, Bryce, Reaves, and HHA's outside employment counsel, Kevin Troutman, worked with Gunsolley to draft a response to Ms. Miniex's grievance. Exhibit DD. This was abnormal because typically HHA Human Resources helps an employee with their grievance response. After reviewing Gunsolley's verbal warning, Bryce and Reaves wrote drafts of Gunsolley's response, using significant portions of their September reports to legitimize the

13

September 8 verbal warning Gunsolley gave Ms. Miniex. Exhibit EE. If not for their unsubstantiated reports, Gunsolley would have had virtually no documentation to justify the verbal warning.  Gunsolley's response was filed on October 31, 2016, with the grievance hearing officer. Exhibit FF.  Although the response had been drafted for Gunsolley, it stated that it was the position statement of the Houston Housing Authority and sent by Troutman, who was listed as HHA's, not Gunsolley's, counsel.

Q.    November 2, 2016: Troutman gives Gunsolley a Playbook for Terminating Ms. Miniex.

On or about November 2, 2016, LaRence Snowden, the new HHA Board Chair, informed Troutman that he should not be involved in the grievance process as Gunsolley's counsel. Exhibit GG. The next day, Troutman emailed Gunsolley to say that he would not represent him, but provided Gunsolley with a detailed strategy for investigating Ms. Miniex's grievance, terminating her, and avoiding any legal issues. *Id.* Troutman then *switched from being Gunsolley's counsel in the grievance process to being counsel for the HHA Board*—the neutral party that would ultimately decide the grievance. Undoubtedly, Troutman had a conflict of interest, but was allowed to proceed as Board counsel.

R.    November 15, 2016: Grievance Hearing Cancelled; Instead, Board asks Troutman to hire a So-Called Neutral Investigator.

The HHA Board decided that, instead of providing Ms. Miniex with a grievance hearing, it would hire a neutral investigator, who would determine if Ms. Miniex's grievance allegations were valid. Exhibit HH. The Board tasked Troutman with hiring the investigator. Predictably, Troutman hired his law firm's long-time investigator Brooks O'Hara—a Human Resources consultant—to conduct the investigation. O'Hara was retained on November 16, 2016.

S.    November 29, 2016: Ms. Miniex Sent Home for Disagreeing with Gunsolley's September 8 Verbal Warning.

Even though O'Hara's investigation was not complete and Ms. Miniex was still waiting

14

for a Board response about her grievance, Gunsolley and Troutman began to plan Ms. Miniex's termination. Exhibit II. Troutman drafted and Gunsolley edited a script that Gunsolley planned to use and send Ms. Miniex home while O'Hara completed his investigation. *Id.* During this "planning" phase, Gunsolley was desperate to justify terminating Ms. Miniex. For example, during a work-related trip he hurriedly scratched out on a notepad from a Washington D.C. hotel room how he could reach the required number of absences needed to terminate Ms. Miniex. Exhibit JJ.

On November 29, 2016, Ms. Miniex was called into a meeting with Gunsolley and HHA's Director of Human Resources, Dianne Mitchell. Exhibits KK. Gunsolley read from the script he prepared and reprimanded Ms. Miniex again for her attendance, department's performance, and attitude. *Id.* Gunsolley asked Ms. Miniex for her "thoughts on improvement" because, according to him, there had been none. *Id.* Ms. Miniex disagreed that she had done anything wrong, but said that "there is always room for improvement." *Id.* She also explained that things had been tense since she filed her grievance, and she was doing the best she could. *Id.* She noted that it was difficult to get Bryce and Reaves to do their work because they were occupied with tasks assigned to them by Gunsolley and had become increasingly insubordinate. *Id.* When Ms. Miniex's responses failed to satisfy Gunsolley, he sent her home with pay and instructed her not to do any work or answer any phone calls or emails. *Id.* Ms. Miniex asked if she was being suspended—a step in the HHA disciplinary process. *Id.* Gunsolley made clear during the meeting and later in writing that she was not being suspended; she was only being sent home "to think about our conversation and to allow the Board to wrap up their investigation" into her grievance. *Id.* When Ms. Miniex attempted to access her HHA email and use her HHA phone after the meeting, both were disconnected. Exhibit LL

T.   December 9, 2016: Ms. Miniex is Terminated from HHA for Disagreeing with Gunsolley's September 8 Verbal Warning.

Ms. Miniex did not hear from HHA until December 8, 2016, when a letter from HHA was delivered to her home and taped to her front door. Exhibit MM. The letter was authored and signed by HHA's Board Chair LaRence Snowden and summarily rejected her grievance, which had been presented to the Board almost a full three months earlier.

The next day, on December 9, 2016, Ms. Miniex received a letter from Tory Gunsolley explaining that HHA's "experienced third-party" investigator concluded that his verbal warning was justified and there was no evidence of discrimination or retaliation. Exhibit NN. Thus, Ms. Miniex's grievance was unjustified. *Id.* Gunsolley claimed that during the November 29, 2016, meeting he took no disciplinary action against Ms. Miniex, but had only voiced his concerns about her lack of improvement. *Id.* Gunsolley concluded that, because Ms. Miniex refused to even acknowledge his "legitimate concerns" and other "emerging facts that raise additional concerns," Ms. Miniex's employment was terminated effective December 12, 2016. *Id.* To this day, neither Gunsolley nor HHA have explained what was meant by Gunsolley's vague reference to "emerging facts that raise additional concerns."

Subsequently, Gunsolley refused to allow Ms. Miniex to return to HHA and collect her belongings.  As was protocol, Dianne Mitchell from Human Resources packed Ms. Miniex's office, with the help of Ms. Miniex's assistant. Exhibit OO (Dep. of D. Mitchell at 73:4-75:14). After Mitchell packed and taped Ms. Miniex's boxes, Gunsolley, Reaves, and Bryce unpacked the boxes purportedly to make sure Ms. Miniex did not take any HHA property.  Exhibit PP (Dep. of D. Bryce at 276:18-281:8). They took items out of the boxes, including certain of Ms. Miniex's cards, awards, and certificates of appreciation (essentially any evidence that she was a stellar and well-liked employee), as well as a copy of her personal cellphone bill. After the box

was repacked, a copy of Gunsolley's alma mater's fight song was placed inside the top of the box. *Id.* Bryce absurdly claims that Ms. Miniex had the fight song hanging next to her office door.  *Id.*  Before the box could be sealed, Mitchell instructed Bryce to take the fight song out. *Id.*

Shortly before Ms. Miniex's official termination date, Gunsolley told HHA employees that Ms. Miniex was terminated because of an investigation into her conduct. Exhibit QQ (Transcript of Recorded Conversation December 2016). Gunsolley barred employees from going in Ms. Miniex's office and told employees not to speak to her about work or anything else. *Id.* Gunsolley maliciously perpetuated the falsehood that Ms. Miniex was terminated for fraud or some other deception.

## II.  APPLICABLE LAW

### A.  Summary Judgement Standard

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. A fact issue is "material" if its resolution could affect the outcome of the action. *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). "Summary judgment is warranted if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine [dispute] as to any material fact and that the movant is entitled to judgment as a matter of law." *Greater Houston Small Taxicab Co. Owners Ass'n v. City of Houston*, 660 F.3d 235, 238 (5th Cir. 2011).

### B.  Federal Rule Procedure 12(f)

Rule 12(f) of the Federal Rules of Civil Procedure permits the district court to strike "an insufficient defense or any redundant, immaterial, impertinent or scandalous matter." FED. R. CIV. P. 12(f). The Court has broad discretion to determine whether the challenged matter should

be stricken. *See In re Beef Indus. Antitrust Litig.,* 600 F.2d 1148, 1168 (5th Cir.1979). "Striking an affirmative defense is warranted if it cannot, as a matter of law, succeed under any circumstance." *United States v. Renda,* 709 F.3d 472, 479 (5th Cir.2013).

*          *          *

Here, certain of HHA's defenses should be dismissed pursuant to Rule 56 because HHA has failed to adduce evidence or should be dismissed pursuant to Rule 12 because HHA cannot succeed on those defenses under any circumstances.

III.      <u>ARGUMENT</u>

A.      <u>HHA has no evidence that Ms. Miniex failed to mitigate her damages.</u>

"Failure to mitigate" is an affirmative defense that requires the employer to prove (1) either that other substantially equivalent positions were available to plaintiff and she failed to use reasonable diligence in attempting to secure those positions, or (2) alternatively, that plaintiff withdrew entirely from the employment market. *See N.L.R.B. v. Laredo Packing Co.*, 730 F.2d 405, 407 (5th Cir. 1984). HHA claims that Ms. Miniex's retaliation damages should be reduced because she failed to mitigate her damages. Dkt. No. 60 at 11, ¶ 71. The only evidence HHA has adduced to support its mitigation defense is the unsworn expert report of Dwight D. Steward. Exhibit RR. As discussed *infra*, HHA has failed to adduce sufficient evidence to support its mitigation affirmative defense and, thus, the defense should be dismissed.

1.      <u>HHA cannot prove that Ms. Miniex has withdrawn from the employment market entirely; the evidence proves that Ms. Miniex has applied for more than 100 positions and has only obtained a temporary document review position.</u>

Ms. Miniex is an accomplished attorney. As noted *supra*, she is a graduate of the prestigious University of Michigan Law School, where she served as an editor on two law journals. At the start of her career, Ms. Miniex received the prestigious Equal Justice Works Fellowship to work in low-income communities, addressing housing and other related poverty

18

issues.  Until she was terminated by HHA, Ms. Miniex has never been involuntarily unemployed.

Since her termination, Ms. Miniex has applied for more than 100 jobs, but has not received an

offer of full-time employment.  All of the documents in her possession that prove her significant

efforts to obtain employment from January 2017 to April 2017, including job applications,

confirmation emails, and rejection emails, have been produced. Ms. Miniex will continue to

supplement her discovery on a rolling basis as she applies for more jobs.  In May 2018, Ms.

Miniex obtained her first position since being terminated—a part-time document review job for

which she received a gross pay of $681.75.  HHA has no grounds to argue that Ms. Miniex has

by any means withdrawn entirely from the employment market.

      2.     <u>HHA has presented no evidence that there were substantially equivalent positions to HHA General Counsel.</u>

Mr. Steward claims that there were positions that were substantially equivalent to Ms.

Miniex's position as General Counsel at HHA.  However, he ***does not list a single specific***

***position that was available***.  Instead, Mr. Steward makes the following conclusory statements

about jobs that were generally available to Ms. Miniex.  Exhibit RR at 9, ¶20; 10, ¶23; 11, ¶¶24,

25.  None of these opinions and the other, similar conclusory opinions in Steward's report are

evidence of the availability of substantially equivalent positions.  The report fails to provide

evidence of what specific positions were/are available or analyze how those positions afford

"virtually identical promotional opportunities, compensation, job responsibilities, working

conditions, and status" as Ms. Miniex's former position with HHA.  Moreover, the Supreme

Court has explained that Ms. Miniex is not required to take just any position "go into another line

of work, accept a demotion, or take a demeaning position." *Ford Motor Co. v. E. E. O. C.*, 458

U.S. 219, 232 (1982).  The position must be substantially equivalent. Therefore, Steward's

opinions are wholly irrelevant to the mitigation inquiry.  Because Steward's expert report fails to

provide any evidence that substantially equivalent employment was available to Ms. Miniex, it fails to raise a fact issue regarding HHA's affirmative defense of mitigation. *Id*. at 231–32.

      3.     <u>HHA has presented no evidence that Ms Miniex failed to use reasonable diligence to obtain any position.</u>

Because Steward's report does not list any specific positions that were available, Steward does not discuss Ms. Miniex's efforts to obtain those unidentified positions. Instead, Steward cites reemployment statistics that are not even specific to the legal job market and speculates about the range of time by which Ms. Miniex should have obtained employment. Exhibit RR at 10, ¶22. This opinion is not evidence; it's speculation. The mitigation inquiry is not an exercise in guesswork and estimation about what Ms. Miniex could or should have done. The inquiry is whether ***Ms. Miniex*** actually used reasonable diligence in attempting to secure those positions. That inquiry is not addressed in the Steward report. Therefore, the report is not evidence that Ms. Miniex failed to use reasonable diligence to obtain any position, and HHA's mitigation affirmative defense should be dismissed.

      4.     <u>HHA's defenses that are duplicative of mitigation should be stricken.</u>

HHA asserts "avoidable consequences" as a defense. Dkt. No. 60 at 12, ¶ 75. This is duplicative of HHA's mitigation affirmative defense (Paragraph 78). *See, e.g., Pulaski Bank and Trust Co. v. Texas American Bank/Fort Worth, N.A.*, 759 S.W.2d 723, 735(Tex. App.—Dallas 1988, writ denied). Defendant's affirmative defense in Paragraph 79 is also duplicative of its mitigation defense. Dkt. No. 60 at 12, ¶ 79. Both duplicative defense should be stricken.

**B.**    <u>The at-will employment doctrine is not a defense to Ms. Miniex's retaliation claims.</u>

HHA claims that the Texas at-will employment doctrine bars Ms. Miniex's FCA retaliation and FMLA retaliation claims: Dkt. No. 60 at 11, ¶ 71. HHA's affirmative defense is improper and should be stricken. Texas follows the doctrine of employment at-will: that is,

subject to statutory and common law exceptions, employment may be terminated by either party at-will and without cause, absent any contractual limitations. *Federal Express Corp. v. Dutschmann*, 846 S.W.2d 282, 283 (Tex. 1993). However, it is well-established that an employer cannot terminate an at-will employee for illegal reasons. *See Jefferies v. Harris Co. Community Action Ass'n*, 615 F.2d 1025, 1036 (5th Cir. 1980). The FMLA makes it illegal to terminate an employee in retaliation for exercising her rights under the FMLA. 29 U.S.C. § 2615(a)(2). Likewise, the FCA makes it illegal to terminate an employee in retaliation for exercising her rights under the FCA. 31 U.S.C. § 3729(h). Accordingly, the employment at-will doctrine is not a defense to Ms. Miniex's FCA retaliation and FMLA retaliation claims.

C.    Ms. Miniex's claims were timely filed; statute of limitations is not a proper defense.

HHA claims that Ms. Miniex's claims are barred by the applicable statute of limitation. Dkt. No. 60 at 11, ¶ 73. HHA's affirmative defense is baseless. The statute of limitations for a violation of the FMLA is within two years of the "last event constituting the alleged violation," or within three years if the violation is willful. 29 U.S.C. § 2617(c)(1)-(2). Likewise, the statute of limitations for a violation of Section 3729(h) of the FCA is three years. 31 U.S.C. § 3730(h)(2). Ms. Miniex claims that HHA took its first adverse action employment action against her on June 21, 2016 with respect to her FCA retaliation and FMLA retaliation claims. Dkt. No. 59 at 13, ¶¶ 38–39. She also alleges that HHA began interfering with her FMLA rights in January 2016. *Id.* at 7–9, ¶¶ 23–28. Ms. Miniex filed suit on February 27, 2017, a little more than a year after the first event giving rise to suit. Dkt. No. 1. Accordingly, Ms. Miniex's claims are timely under the applicable FCA and FMLA statutes of limitation.

D.    HHA has no evidence that Ms. Miniex had a pre-existing conditions that would limit her entitlement to mental anguish, emotional pain, and other non-pecuniary losses.

Ms. Miniex seeks damages for "emotional pain, suffering, inconvenience, mental

anguish, loss of enjoyment of life, and other nonpecuniary losses" that resulted from HHA's misconduct.   Dkt. No. 59 at 21, ¶ 65(c). HHA claims that Ms. Miniex's non-pecuniary losses should be reduced.   Dkt. No. 60 at 13, ¶ 83. HHA has no evidence that Ms. Miniex had any pre-existing conditions that warrant the reduction of Ms. Miniex's non-pecuniary losses.

E.   HHA's "laundry list" of affirmative defenses should ***all*** be stricken for failing to meet the requirements of Federal Rule of Civil Procedure 8.

The Federal Rules of Civil Procedure require affirmative defenses to be pled with the same level of specificity as a complaint. *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999).   In *Twombly*, the Supreme Court clarified the specificity standard for pleadings, stating that they must "provide the 'grounds' of [the party's] 'entitle[ment] to relief' [which] ***requires more than labels and conclusions, and a formulaic recitation*** of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 548 (2007) (emphasis added) (citation omitted). This pleading standard is equally applicably to a defendant's defenses. *Woodfield* 193 F.3d at 362. In Paragraph 75 of HHA's Answer, HHA conclusory asserts the following:   "Plaintiff's claims may be barred in whole or in part by the doctrines of laches, waiver, estoppel, avoidable consequences, after-acquired evidence, and/or unclean hands." These defenses should be stricken pursuant to Rule 12(f).   Certain of the claims—after-acquired evidence, laches, waiver, estoppel, and unclean hands—also should be dismissed for the reasons stated below.

F.   HHA's "after-acquired evidence" defense should be dismissed.

The after-acquired evidence defense provides that where an employer discovers after termination that the employee engaged in wrongdoing, neither reinstatement nor front pay is an appropriate remedy. *See McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360 (1995). HHA asserted this defense without having any evidence to support it. When asked why Ms.

Miniex was terminated, no witness mentioned any "after-acquired evidence" that Ms. Miniex engaged in any wrongdoing.  Dkt. No. 60 at 12, ¶ 75.  Defendant's after-acquired evidence defense, therefore, should be dismissed as a matter of law.  The Court should also strike HHA's duplicative "after-acquired evidence" defense (Paragraph 84) for the reasons stated *supra* and, alternatively, because it is duplicative.

G.     HHA's laches affirmative defense should be dismissed.

Laches is an equitable remedy that bars a claim brought within the applicable statute of limitations.  The two essential elements of laches are: "(1) unreasonable delay by one having legal or equitable rights in asserting them; and (2) a good faith change of position by another to his detriment because of the delay." *Caldwell v. Barnes*, 975 S.W.2d 535, 538 (Tex. 1998) (citation omitted).  Laches, in the absence of extraordinary circumstances, generally "will not bar a suit short of the period set forth in the limitation statute." *Id.* (citation omitted). As noted, the statute of limitations for an FMLA violations is 2-3 years and an FCA retaliation claim is 3 years.  Ms. Miniex filed suit on February 27, 2017, which is well within the statute of limitations. Dkt. No. 1 at 1. Defendant does not assert that there was "unreasonable delay," a "change of position," or any "extraordinary circumstances" that would bar this suit.  Defendant's laches defense should be dismissed.

H.     HHA's waiver affirmative defense should be dismissed.

Waiver is the intentional relinquishment of a known right, or the intentional engagement in conduct that is inconsistent with the claiming of a known right. *Sun Exp. &. Prod. Co. v. Benton*, 728 S. W. 2d 35, 37 (Tex. 1987).  There is no evidence that Ms. Miniex waived her right to any claim, nor is there any evidence that Ms. Miniex unequivocally manifested an intent to waive his right to her claims.  Therefore, Defendant's waiver affirmative defense should be dismissed.

23

I.      HHA's estoppel affirmative defense should be stricken or, in the alternative, dismissed.

There are at least three different theories of estoppel: (1) equitable estoppel (*Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 489 (Tex. 1991)); (2) judicial estoppel (*Moore v. Neff*, 629 S.W.2d 827, 828–29 (Tex. App. 1982); and (3) estoppel by deed or contract (*Ex parte Payne*, 598 S.W.2d 312, 317 (Tex. App. 1980).  Defendant's pleading, however, fails to even cite what theory of estoppel is being contemplated. Rather, Defendant merely lists this affirmative defense along with several other in its laundry list of affirmative defenses.  Dkt. No. 60 at 12, ¶ 75.  Further, Defendant has not adduced any evidence that Ms. Miniex is estopped from proceeding with any of her claims.  Therefore, HHA's estoppel defense should be stricken or, in the alternative, dismissed for lack of evidence.

J.      HHA's unclean hands affirmative defense should be dismissed.

In its laundry list of affirmative defenses, Defendant claims that Ms. Miniex's claims are barred by unclean hands.  Dkt. No. 60 at 12, ¶ 75.  There is no evidence, however, to support HHA's defense of unclean hands. The unclean hands doctrine requires that one who comes into equity must come with "clean hands."  *Munzenrieder & Assocs., Inc. v. Dalgle*, 525 S.W.2d 288, 291 (Tex. App. 1975).  This means that a court, acting in equity, will refuse to grant relief to a plaintiff who has been guilty of unlawful or inequitable conduct with regard to the issue in dispute. 30 C.J.S. Equity § 93 (1965).  To prove unclean hands, HHA must show that Ms. Miniex made an affirmative misrepresentation of material fact with the intent to deceive HHA and that HHA suffered injury as a result.  *See United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 567 (5th Cir. 2005).  HHA cannot prove unclean hands because it has offered no evidence of Ms. Miniex having affirmatively misrepresented a material fact to HHA with the intent to deceive it, or that HHA suffered injury therefrom. Therefore, HHA's unclean hands defense should be dismissed.Respectfully Submitted,

*/s/ Zenobia Harris Bivens*
Zenobia Harris Bivens
*State Bar No. 24065378*
*Joel M. Androphy*
*State Bar No. 01254700*
*Justin C. Pfeiffer*
*State Bar No. 24091473*
*Berg & Androphy*
*3740 Travis Street*
*Houston, Texas 77002*
*Telephone (713) 529-5622*
*Facsimile (713) 529-3785*

*Email: zbivens@bafirm.com*
*Email: jandrophy@bafirm.com*
*Email: jpfeiffer@bafirm.com*

Attorneys for Plaintiff
Karen Miniex

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on this date the foregoing was electronically filed with the Clerk of the Court using the CM/ECF System.

Dated this 13th day of July, 2018.

<u>*/s/ Zenobia Harris Bivens*</u>
Zenobia Harris Bivens

BERG & ANDROPHY
3704 Travis Street
Houston, Texas 77002
Tel.  713-529-5622