United States District Court
Southern District of Texas
**ENTERED**
September 05, 2019
David J. Bradley, Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| KAREN MINIEX, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:17-0624 |
| | § | |
| HOUSTON HOUSING AUTHORITY, | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Before the Court in this False Claims Act ("FCA") retaliation lawsuit is Defendant Houston Housing Authority's ("HHA") Brief in Support of Renewed Motion for Judgment as a Matter of Law, or Alternatively, Motion for New Trial or Remittitur ("HHA's Motion") [Doc. # 257].[1]  Plaintiff Karen Miniex filed a response.[2]   The Motion is ripe for decision.[3]  Based on the parties' briefing, pertinent matters of record, testimony and evidence introduced at trial, and relevant legal authority, the Court **grants in limited part and otherwise denies** Defendant HHA's Motion.

---

[1]     Defendant Houston Housing Authority's Unopposed Motion for Leave to Exceed Page Limit for Submission of Brief in Support of Motion for Judgment as a Matter of Law, or Alternatively, Motion for New Trial or Remittitur [Doc. # 256], is **granted**.

[2]     Plaintiff Karen Miniex's Response in Opposition to Defendant's Brief Renewed Motion for Judgment as a Matter of Law, or Alternatively, Motion for New Trial or Remittitur ("Response") [Doc. # 266].  Plaintiff Karen Miniex's Unopposed Motion to Extend Page Limit [Doc. # 265], is **granted**.

[3]     HHA has not replied, and its time to do so has expired.  *See* Hon. Nancy F. Atlas, Court Procedures and Forms, R.7(A)(4).

## I.   **INTRODUCTION**

Defendant HHA, one of the nation's largest public housing authorities, hired Plaintiff Karen Miniex in March 2012 to serve as its general counsel.   Miniex served in that role until HHA's President and CEO, Tory Gunsolley, terminated her employment in December 2016 following a dispute over the proper handling of a fraud investigation.   After her termination, Miniex sued HHA, alleging she was retaliated against in violation of the FCA for reporting her concerns about systemic fraud in HHA's housing voucher program.   After a six-day trial,[4] the jury entered a verdict in Miniex's favor.[5]   Pursuant to the jury's verdict, the Court awarded Miniex $751,502 in back pay, $600,000 in front pay, $46,786 in pre-judgment interest, and $317,750 and $215,000 in past and future mental anguish, respectively.[6]

HHA seeks judgment as a matter of law ("JMOL"), a new trial, or remittitur. HHA contends JMOL is appropriate because no reasonable jury could find, based on the trial evidence and testimony, that Miniex proved three essential elements of her FCA retaliation claim—namely, that her reports were protected, went beyond her job duties, and were known of by Gunsolley.   HHA next asserts that a new trial is warranted based on allegedly erroneous jury instructions and Miniex's lack of evidence suggesting that her reports caused Gunsolley to discipline and terminate

---

[4]      *See* Jury Trial—Day 1 ("Trial Tr. 1") [Doc. # 249]; Jury Trial—Day 2 ("Trial Tr. 2") [Doc. # 250]; Jury Trial—Day 3 ("Trial Tr. 3") [Doc. # 251]; Jury Trial—Day 4 ("Trial Tr. 4") [Doc. # 252]; Jury Trial—Day 5 ("Trial Tr. 5") [Doc. # 253]; Jury Trial—Day 6 ("Trial Tr. 6") [Doc. # 254].

[5]      Verdict Form [Doc. # 233].

[6]      Final Judgment [Doc. # 242].

her.  Finally, HHA argues Miniex's wage and noneconomic damages awards are unsupported by evidence, excessive, and should be remitted.

The majority of HHA's arguments lack merit.  The Court concludes that the jury was properly instructed and reasonably found for Miniex on all essential elements of her FCA retaliation claim.  Moreover, the back pay award is supported by trial evidence and is not excessive.   The Court, however, concludes that Miniex's front pay and noneconomic damage awards are excessive.  The Court therefore **denies in large part** HHA's Motion, but downwardly amends Miniex's front pay award to $216,861 and Miniex's future noneconomic damage award to a nominal figure of $100.  The Court further **grants** HHA's Motion for remittitur of Miniex's past noneconomic damages and requires Miniex to elect between lowering her past noneconomic damages to $217,070.34 and the Court holding a new trial.

## II.   <u>BACKGROUND</u>

The parties' proof at trial established the following facts.   HHA is a governmental entity that provides affordable housing to low-income individuals in the Houston area.[7]   To fulfil its mission, HHA administers public housing and issues housing vouchers to eligible individuals through its Housing Choice Voucher Program ("HCVP").[8]   HHA also administers a Veterans' Affairs Supportive Housing ("VASH") program, which provides housing vouchers to chronically homeless veterans referred through the Veterans Administration ("VA").[9]   While the VASH program has distinct eligibility requirements from

---

[7]     Trial Tr. 3 at 118:13-22.

[8]     Trial Tr. 2 at 60:8-23, 148:5-149:9, 162:16-163:1.

[9]     Trial Tr. 1 at 49:20-22; Trial Tr. 2 at 110:16-111:20, 162:16-163:4.

HCVP, the VASH program is managed by HCVP management.[10]  HHA's primary source of funding for its programs is the U.S. Department of Housing and Urban Development ("HUD").[11]

In March 2012, Tory Gunsolley, HHA's President and CEO, hired Karen Miniex to serve as HHA's general counsel.[12]  From 2012 through 2015, Gunsolley awarded Miniex positive reviews and pay raises.[13]

As HHA's general counsel, Miniex oversaw investigations into employee and client fraud.[14]  HHA's fraud investigator, Benjamin Skalka, reported directly to Miniex.[15]  When Skalka investigated fraud, he communicated his findings to Miniex, she directed his efforts, and they coordinated the drafting of formal fraud reports.[16]  When a fraud report was finalized, Miniex submitted the report to Gunsolley.[17]  If Gunsolley decided it was appropriate, he would present the matter

---

[10]  Trial Tr. 2 at 162:16-163:1-4.

[11]  *Id.* at 150:3-12.

[12]  *Id.* at 170:14-17.

[13]  *Id.* at 172:6-173:9, 174:20-175:25; 177:23-178:15, 181:7-11; Performance Appraisal dated December 1, 2019 [Doc. # 236-2]; Summary of FY 2012 Performance Appraisal [Doc. # 236-3]; Performance Appraisal dated October 4, 2013 [Doc. # 236-5]; Summary of FY 2013 Performance Appraisal [Doc. # 236-6]; Performance Appraisal dated November 24, 2014 [Doc. # 236-8]; Summary of FY2014 Performance Appraisal [Doc. # 236-9]; Summary of FY2015 Performance Appraisal [Doc. # 236-10].

[14]  Trial Tr. 2 at 182:8-9; Trial Tr. 4 at 141:24-142:3.

[15]  Trial Tr. 1 at 23:11-14.

[16]  *Id.* at 45:14-46:3; Trial Tr. 2 at 85:18-86:2.

[17]  Trial Tr. 1 at 46:4-18.

to HHA's Board of Commissioners ("Board"),[18] HHA's governing authority.[19] Both Miniex and Skalka would frequently contact and work with HUD's Office of Inspector General ("HUD-OIG"), the division in HUD tasked with combatting fraud.[20]

In the first half of 2016, Skalka discovered that two HHA employees within the HCVP program, Shawntea Radford and Carmen Newland, were involved in separate fraudulent schemes to sell housing vouchers.[21]   During his two investigations, Skalka observed HCVP protocol violations and other management decisions that raised his suspicions that a fraud cover-up was ongoing.[22]  Skalka's investigations, his and Miniex's subsequent reports, and HHA's handling of those reports are a focus of this lawsuit.

---

[18]    Gunsolley testified at trial that "normally" Miniex did not present fraud cases to the Board.  Trial Tr. 3 at 225:8-18; Trial Tr. 2 at 233:5-10 (Gunsolley's testimony that "[h]istorically" Miniex had not presented "the majority of fraud cases" to the Board).  Instead, Gunsolley would present the fraud cases to the Board and Miniex would be available for questions.  Trial Tr. 2 at 223:5-17; Trial Tr. 3 at 21:21-22:25.  Miniex testified that Gunsolley typically gave reports to the Board and Miniex would be present at Board meetings to answer questions or provide additional information if requested.  Trial Tr. 4 at 66:14-67:8.  Miniex testified she did not make recommendations directly to the Board regarding fraud investigations and it was not one of her job duties to notify the Board if there was fraud.  *Id.* at 142:4-19.

[19]    Trial Tr. 3 at 133:18-19.  HHA's Board is appointed by the Mayor of Houston.  Trial Tr. 2 at 170:2-4.  HHA's Board is responsible for hiring and firing HHA's President and CEO, and the President and CEO is in turn responsible for hiring and firing all other HHA employees.  Trial Tr. 2 at 169:18-170:1.

[20]    Trial Tr. 2 at 75:2-4, 124:15-25, 125:4-6.

[21]    Trial Tr. 1 at 24:18-24, 25:17-23, 29:14-19, 30:2-4, 48:10-20.

[22]    Trial Tr. 2 at 87:20-88:2.

Skalka began his investigation into Radford in late January 2016.[23]   During this investigation, Skalka learned that while Radford was working for HHA, she had been arrested for felony tampering with government documents and received deferred adjudication.[24]   Robin Walls, HCVP's director, conducted witness interviews and investigated Radford's fraud without informing Skalka or the legal department.[25]

On February 11, 2016, Miniex submitted to Gunsolley a report by Skalka concerning Radford's fraud in the HCVP program.[26]   Miniex informed Gunsolley she had notified HUD-OIG about Radford's fraud.[27]   As a result of the incident, Radford was suspended and her employment at HHA was terminated thereafter.[28]

Skalka began his investigation into Newland in May 2016.[29]   Before Skalka was informed of the matter, Walls conducted an internal investigation and concluded that the problems arose from administrative errors by the VA.[30]   Skalka would later find this conclusion implausible because documents within the relevant files had clearly been manipulated; name entries had been whited out and written

---

[23]     Trial Tr. 1 at 46:21-47:24.

[24]     Trial Tr. 2 at 67:23-68:14.

[25]     Trial Tr. 1 at 39:24-40:8; Trial Tr. 2 at 65:7-66:18.

[26]     Fraud Investigation concerning Shawnta Radford—Housing Specialist ("Skalka's Radford Report") [Doc. # 236-15], at 1, 10; Trial Tr. 1 at 46:13-20.

[27]     Email from Karen Miniex to Tory Gunsolley, dated March 9, 2016 [Doc. # 236-16].

[28]     Trial Tr. 1 at 48:2-5.

[29]     *Id.* at 53:1-3.

[30]     Trial Tr. 2 at 80:24-81:12.

over by hand.[31]   According to Skalka, the fraud was "black and white."[32]   On the day Skalka began his investigation in earnest, Mark Thiele, the Vice President of HCVP, provided Skalka with a stack of client files that Thiele and Walls had identified were not VASH eligible.[33]   This was suspicious to Skalka because it indicated HCVP management had known of multiple transgressions but had not informed Skalka or the legal department.[34]   Skalka also learned Walls had approved Newland for unlimited overtime while Newland was under investigation for a different problem, time clock fraud, and Newland averaged 20 to 40 overtime hours a week.[35]   Newland's direct supervisor, Patricia Doggett, admitted during an interview with Skalka that she was "unclear" as to her duties, had not done a quality control screening on Newland's files, and she "didn't want to throw Carmen Newland under the bus."[36]

On June 14, 2016, Miniex submitted to Gunsolley a report by Skalka on Newland's fraud in connection with the VASH program, along with several exhibits documenting Newland's fraudulent scheme.[37]   Skalka concluded that Newland had been selling VASH vouchers to persons with no association with the

---

[31]     *Id.* at 81:13-82:22.

[32]     Trial Tr. 1 at 49:5-19.

[33]     Trial Tr. 2 at 88:5-24.

[34]     *Id.* at 88:25-89:8.

[35]     Trial Tr. 1 at 50:24-51:6.

[36]     *Id.* at 54:19-24, 56:3-8, 57:2-7.

[37]     Trial Tr. 2 at 85:2-9; Fraud Investigation concerning Carmen Newland—Housing Specialist ("Skalka's Newland Report") [Doc. # 236-79], at 1.

VA.[38]   Along with Skalka's report, Miniex submitted a cover letter where she recommended Newland's termination.[39]   Miniex further recommended the termination of three HCVP managers—Mark Thiele, Robin Walls, and Patricia Doggett—for negligent supervision.[40]   Miniex reasoned that based on the level of fraudulent activities Radford and Newland had achieved, the HCVP managers knew or should have known of the fraud.[41]   Miniex requested that she be allowed to present the Newland matter to HHA's Board, and recommended that HHA hire a third party to investigate how widespread the problem was and whether vouchers were being fraudulently issued on a systemic basis.[42]   Miniex added that she had informed HUD-OIG of Newland's fraud and that she deferred to Gunsolley, HHA's Board, and HUD-OIG on next appropriate steps.[43]

Gunsolley responded to Miniex the same day he received Skalka's report, the exhibits, and Miniex's cover letter.[44]   Gunsolley explained that he was not convinced that there was enough evidence to terminate anyone, including Newland or Doggett, even though he had not read the attached exhibits.[45]   Gunsolley also

---

[38]   Trial Tr. 2 at 114:8-14; Skalka's Newland Report at 9.

[39]   Summary Cover Report (Amended)—Allegations Against Carmen Newland ("Miniex's Cover Letter") [Doc. # 236-79], at 1.

[40]   *Id.* at 1-2.

[41]   *Id.* at 1.

[42]   *Id.* at 2.

[43]   *Id.*

[44]   Email from Karen Miniex to Benjamin Skalka, dated June 14, 2016 ("Miniex's June 14 Email to Skalka") [Doc. # 236-20].

[45]   Trial Tr. 2 at 206:20-207:12, 208:24-209:5; Trial Tr. 4 at 31:13-18, 32:8-11.

told Miniex that the sale of veterans vouchers did not really matter because there were more vouchers than veterans.[46]   Gunsolley directed Skalka to interview Robin Walls regarding unspecified inaccuracies.[47]   Skalka interviewed Walls, who said that discrepancies in VASH files were attributable to VA errors.[48]   Skalka did not credit this assertion and determined that the only inaccuracy in his report was a misspelling of Walls's name.[49]   Following several more interviews, Skalka submitted an amended report, correcting the spelling error.[50]   Bryce, who also was present during the Walls interview, advised Gunsolley in an email that he should consider hiring a third party to investigate "whether vouchers are being issued fraudulently on a systemic basis."[51]   Bryce acknowledged that "[t]wo incidents in such a short period of time certainly gives one pause as to just how widespread the problem may be."[52]

On June 20, 2016, Gunsolley and Miniex met to discuss Skalka's amended report and her recommendations to terminate HCVP management and hire an

---

[46]   Trial Tr. 4 at 31:13-18.  Miniex relayed this statement to Katie Anderson, a third-party investigator HHA hired to investigate fraud in HCVP.  Trial Tr. 5 at 285:1-5. When Anderson confronted Gunsolley with whether he made this statement to Miniex, he did not deny making it.  Trial Tr. 5 at 285:20-286:13.

[47]   Trial Tr. 2 at 86:19-22, 89:17-24; Trial Tr. 4 at 32:12-18, 33:4-25.

[48]   Trial Tr. 2 at 91:14-22.

[49]   Trial Tr. 1 at 61:17-62:2; Trial Tr. 2 at 131:5-20.

[50]   Trial Tr. 2 at 91:23-92:3, 94:21-23.

[51]   David Bryce's Email to Tory Gunsolley dated June 20, 2016 ("Bryce's June 20 Email to Gunsolley") [Doc. # 236-79], at 3.

[52]   *Id.*

outside investigator.[53]  Gunsolley, who still had not reviewed the relevant exhibits at the time, did not respond or answer how he would handle either of Miniex's recommendations.[54]  Miniex asked for permission to present her report at the Board meeting the next day.[55]  Gunsolley denied her request.[56]

On June 21, 2016, before the Board convened, Gunsolley called Miniex to his office.[57]  Gunsolley told Miniex he would recommend termination of Newland but not Doggett, Walls, or Thiele.[58]  Miniex asked Gunsolley how he could reach this conclusion without reviewing the exhibits, and Gunsolley explained that a review would not change anything.[59]  As Miniex left Gunsolley's office, Gunsolley asked Miniex to be a "team player," if she was "happy working at HHA," and to think about whether she wanted to be at HHA.[60]

At the Board meeting, Gunsolley presented Newland's fraud as a personnel matter.[61]  Gunsolley told the Board that despite the discovery of two fraudulent

---

[53]    Trial Tr. 2 at 222:18-21; Trial Tr. 4 at 34:18-25, 36:24-37:20.

[54]    Trial Tr. 4 at 50:7-20; Interoffice Memorandum by Karen Miniex, dated June 20, 2016 [Doc. # 236-22].

[55]    Trial Tr. 4 at 35:15-22.

[56]    Trial Tr. 2 at 222:22-25, 224:15-20; Trial Tr. 4 at 35:15-22.

[57]    Trial Tr. 4 at 50:21-51:1.

[58]    *Id.* at 51:4-25.

[59]    *Id.* at 60:10-61:13.

[60]    Trial Tr. 2 at 237:10-12, 244:3-8; Trial Tr. 4 at 54:11-55:7.  *See* Email from Karen Miniex to Tory Gunsolley, dated June 22, 2016 ("Miniex's June 22 Email") [Doc. # 236-25], at 2.

[61]    Trial Tr. 4 at 56:7-21.

schemes to sell vouchers, no systemic issues in HCVP existed.[62]   Gunsolley explained that part of the reason Newland's fraud went undetected was because of issues HHA had coordinating with the VA and that the problem could be the result of administrative errors.[63]   Miniex, who was present at the Board meeting, did not speak on the Newland matter.[64]

On June 22, 2016, Miniex sent an email to Gunsolley memorializing their June 21, 2016, meeting and stating that she found several of his statements threatening.[65]   In response, Gunsolley drafted, but did not send, an email demanding an apology from Miniex, adding that if she could not apologize, she needed to seek employment elsewhere.[66]   Gunsolley never sent the email.[67]

On June 23, 2016, Miniex contacted Nicole Taylor, counsel for the Board, and stated she believed that Gunsolley had not been forthright with the Board in reporting the Newland matter.[68]   Taylor told Miniex to send her and two other Board members Miniex's and Skalka's fraud investigation report and exhibits.[69] Miniex did so and contacted the two Board members about her concerns.[70]

---

[62]     *Id.*

[63]     Trial Tr. 2 at 227:2-10; Trial Tr. 4 at 56:22-57:1, 58:25-59:5.

[64]     Trial Tr. 4 at 66:14-24.

[65]     Miniex's June 22 Email at 1-2.

[66]     Trial Tr. 2 at 236:16-237:18.

[67]     *Id.*

[68]     Trial Tr. 4 at 72:4-20.

[69]     *Id.* at 73:5-15, 74:13-20.

[70]     *Id.* at 73:5-74:20, 75:14-19, 77:17-24, 79:2-7.

On or before June 30, 2016, Gunsolley learned that Miniex had contacted members of HHA's Board about her concerns regarding the Newland fraud investigation.[71]   Gunsolley testified at trial that this "really ticked [him] off."[72] Around this time, according to Miniex, her interactions with Gunsolley became hostile and Gunsolley started to avoid and ignore her.[73]

On June 30, 2016, Gunsolley responded to Miniex's June 22, 2016, email.[74] Gunsolley stated that he had decided to hire a third party to investigate HCVP.[75]   In July 2016, HHA's Board hired a third-party investigator, Katie Anderson of the law firm Strasburger & Price LLP, to investigate HCVP.[76]

At some point in July or August 2016, Miniex and Skalka attended a confidential, off-site meeting with HUD-OIG.[77]   FBI agents were present at the meeting, which neither Miniex nor Skalka had previously experienced.[78]   Miniex and Skalka turned over their reports on Newland's fraud and discussed the Newland matter.[79]   HUD-OIG and the FBI asked Miniex and Skalka questions

---

[71]   Trial Tr. 2 at 233:21-234:2; Trial Tr. 3 at 30:23-25.

[72]   Trial Tr. 2 at 234:3-5.

[73]   Trial Tr. 4 at 91:3-92:2.

[74]   Email from Tory Gunsolley to Karen Miniex, dated June 30, 2019 ("Gunsolley's June 30 Email to Miniex") [Doc. # 236-27].

[75]   *Id.*

[76]   Trial Tr. 3 at 31:1-13; Trial Tr. 4 at 92:18-25.

[77]   Trial Tr. 2 at 95:11-21, 97:10-12.

[78]   *Id.* at 95:11-15, 96:2-9.

[79]   *Id.* at 95:22-96:1, 97:5-9.

regarding Gunsolley as well as HHA's purchase of various properties for use as public housing units.[80] After the meeting with HUD-OIG and the FBI, Skalka told David Bryce and Bennett Reaves, two attorneys who worked under Miniex, about the meeting and what transpired.[81]

On September 2, 2016, Reaves and Bryce met with Gunsolley to discuss concerns they had with Miniex. Both stated Miniex had become completely disengaged from her job; was telling attorneys not to do work requested of them by others in HHA; was not responding to emails; had repeatedly cancelled staff meetings; was refusing to meet with Reaves and Bryce; was intentionally slowing down work in the legal department; and was habitually absent and tardy.[82] Bryce told Gunsolley he had been monitoring and recording Miniex's attendance for years and that Miniex was habitually tardy and absent.[83] Gunsolley asked Reaves and Bryce to reduce their concerns to writing, and they both turned in written reports on September 7, 2016.[84] Reaves's and Bryce's written memoranda each reported multiple specific examples of Miniex's misconduct and disengagement.[85] Bryce also submitted a calendar that allegedly documented when Miniex arrived

---

[80]    *Id.* at 95:22-96:1, 96:10-23.

[81]    *Id.* at 97:13-24, 98:5-21, 99:7-20.

[82]    *Id.* at 245:8-246:14.

[83]    *Id.* at 246:10-247:8, 248:24-249:2.

[84]    Trial Tr. 1 at 77:24-25; Memorandum from Bennett Reaves to Tory Gunsolley Re: Matters Concerning General Counsel ("Reaves' Memorandum") [Doc. # 236-32]; Memorandum from David Bryce to Tory Gunsolley Re: Karen Miniex ("Bryce's Memorandum") [Doc. # 236-33].

[85]    Reaves's Memorandum at 1-6; Bryce's Memorandum at 4-11.

and left the office from May to September 2016.[86]  This calendar purports to show that Miniex was chronically tardy and absent during that time period.[87]   Both Reaves and Bryce stated in their reports that Skalka had told them Miniex had met with HUD-OIG and the FBI regarding the Radford and Newland incidents and the FBI asked questions about Gunsolley and whether he was involved.[88]

On September 8, 2016, without interviewing anyone else in the legal department, Gunsolley met with Miniex[89] and issued her what the parties refer to as a "Verbal Written Warning."[90]  Gunsolley cited Miniex's tardies, unscheduled absences, failure to communicate tardies and absences, productivity concerns, and attitude and professionalism as the basis for the warning.[91]  Gunsolley stated that he needed Miniex "to resolve and set aside any issues that are lingering from our conversations related to the VASH investigation" and that he needed Miniex "to get on the team and be a team player."[92]

On September 13, 2016, Miniex filed a grievance against Gunsolley with the Board, asserting Gunsolley's Verbal Written Warning was retaliation for her whistleblower activity.[93]

---

[86]     Bryce's Memorandum at HHA2_007788-93.

[87]     *Id.*

[88]     Reaves's Memorandum at 7; Bryce's Memorandum at 2.

[89]     Trial Tr. 2 at 255:22-256:5.

[90]     Employee Disciplinary Action, Verbal Warning Conference, dated September 8, 2016 ("Verbal Written Warning") [Doc. # 236-36].

[91]     *Id.*

[92]     *Id.*

[93]     Trial Tr. 3 at 91:13-15, 93:2.

On September 16, 2016, Katie Anderson, the attorney HHA hired to perform the third party investigation of the HCVP program, completed her investigation.[94] Anderson acknowledged that she made a "cost-effective decision" not to investigate allegations that two other former HCVP housing specialists had been involved in Newland's fraudulent scheme.[95]   Anderson concluded that HCVP management was not involved in and did not have actual knowledge of Newland's fraudulent scheme, in part, because of HCVP's failure to supervise Newland.[96] Anderson concluded that Patricia Doggett—Newland's direct supervisor whom Mark Thiele and Robin Walls in turn supervised—was "probably not qualified or capable to perform the functions of [her] job."[97]   Doggett herself complained to Anderson that HCVP had systemic problems and "no one was watching."[98] Anderson concluded that HCVP lacked enough "checks and balances" to prevent Newland's fraud and that she would characterize the problem as negligent supervision.[99]

On November 16, 2016, HHA retained an independent investigator who reviewed Miniex's grievance.[100]   The investigator only interviewed Reaves and

---

[94]   Email from Katie Anderson to Nicola Toubia, dated September 16, 2016 [Doc. # 236-39].

[95]   Trial Tr. 5 at 273:10-20.

[96]   *Id.* at 251:19-252:2, 253:23-254:3, 273:10-20.

[97]   *Id.* at 283:13-21, 300:17-24, 302:3-11.

[98]   *Id.* at 301:16-23.

[99]   *Id.* at 265:16-24, 306:16-307:15.

[100]   *Id.* at 109:7-110:6.

Bryce in the legal department and did not investigate any of the examples of productivity issues Reaves and Bryce identified in their memoranda.[101]

On November 29, 2016, Gunsolley met with Miniex and suspended her with pay and without email access.[102]

On December 8, 2016, HHA's Board sent Miniex a letter explaining that the independent investigator determined her grievance was unfounded and that Gunsolley's September 8, 2016, Verbal Written Warning was appropriate.[103]

On December 9, 2016, Gunsolley sent Miniex a termination letter, citing her unscheduled absences, tardies, poor productivity, disengagement, and failure to acknowledge these issues as legitimate as the basis for her termination.[104]

Miniex filed this lawsuit on February 27, 2017.[105]  Miniex asserted claims for FCA retaliation, deprivation of due process, and interference and retaliation with her rights under the Family and Medical Leave Act.[106]  After substantial discovery, HHA moved for summary judgment dismissal of all claims.[107]

---

[101]    Trial Tr. 3 at 111:4-112:19.

[102]    *Id.* at 99:7-25, 106:24-108:17.

[103]    *Id.* at 113:11-115:6.

[104]    Letter from Tory Gunsolley to Karen Miniex, dated December 9, 2016 [Doc. # 236-47].

[105]    Plaintiff's Original Complaint [Doc. # 1].

[106]    Plaintiff's Third Amended Complaint [Doc. # 59].

[107]    Motion for Summary Judgment [Doc. # 105].

Magistrate Judge Dena Palermo recommended granting HHA's motion in full.[108] This Court adopted in part and overruled in part Judge Palermo's recommendation, and granted summary judgment in favor of HHA on all Miniex's claims except her FCA retaliation claim.[109]

After a six-day jury trial on the FCA retaliation claim, the jury found for Miniex.[110]   Based on the jury's verdict, the Court entered final judgment for Miniex, awarding her $751,502 in back pay, $46,786 in pre-judgment interest on her back pay, $600,000 in front pay, $317,750 for past mental anguish, and $215,000 for future mental anguish.[111]

## III.   RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

To succeed on her FCA retaliation claim, Miniex must demonstrate (1) she engaged in protected activity under the FCA, (2) HHA knew she engaged in protected activity, and (3) she suffered an adverse employment action because she engaged in protected activity.  *See* 31 U.S.C. § 3730(h)(1); *U.S. ex rel. Bias v. Tangiapahoa Par. Sch. Bd.*, 816 F.3d 315, 323 (5th Cir. 2016).   HHA asserts judgment as a matter of law ("JMOL") is warranted for two reasons.  First, HHA argues the contents of Miniex's reports are not protected by the FCA.  Second, HHA contends that because reporting fraud was one of Miniex's job duties as HHA's general counsel, Miniex cannot, as a matter of law, demonstrate either that

---

[108]   Order on Cross Motions for Summary Judgment [Doc. # 171].  Based on a defect in the parties' consent, this Court deemed Judge Palermo's order as a "Report and Recommendation."  *See* Hearing Minutes & Order [Doc. # 176].

[109]   Memorandum and Order Adopting in Part and Overruling in part Magistrate Judge's Recommendation [Doc. # 182].

[110]   Verdict Form at 2-6.

[111]   Final Judgment.

her reports were protected activity or that HHA had notice of her allegedly protected activity.

Both grounds are unpersuasive.   As explained hereafter, HHA's first argument is forfeited because HHA failed to raise it in its original motion for JMOL.   In any event, on the merits, the Court concludes the contents of Miniex's reports are protected under the FCA.   HHA's second argument fails because the jury could, and did, reasonably find that Miniex's reporting went beyond the scope of her job duties and HHA had notice of her reports.    Therefore, the Court **denies** HHA's renewed motion for JMOL.

### A.    Legal Standard for Judgment as a Matter of Law

Under Federal Rule of Civil Procedure 50, a party may, before the case has been submitted to the jury, move for judgment as a matter of law on an issue. FED. R. CIV. P. 50(a)(2).   "The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment."   *Id.*   The Court may grant JMOL on an issue if it "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."   *Id.* 50(a)(1).   If the Court does not grant the motion, the movant may renew its motion for JMOL following the entry of judgment.   *Id.* 50(b).

"A litigant cannot obtain judgment as a matter of law unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion."   *OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*, 841 F.3d 669, 675 (5th Cir. 2016) (internal quotation marks omitted).   The Court must draw "all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that we might regard as more reasonable."   *Id.*   "[I]t is the function of the jury as the traditional finder of the facts, and not for the Court, to weigh conflicting evidence and inferences, and

determine the credibility of witnesses." *Roman v. W. Mfg., Inc.*, 691 F.3d 686, 692 (5th Cir. 2012).

"Any argument made in a renewed motion for judgment as a matter of law under Rule 50(b) must have been previously made in a motion for judgment as a matter of law under Rule 50(a)." *OneBeacon Ins. Co.*, 841 F.3d at 676. "If a party fails to move for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) on an issue at the conclusion of all of the evidence, that party waives both its right to file a renewed post-verdict Rule 50(b) motion and also its right to challenge the sufficiency of the evidence on that issue on appeal." *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 238 (5th Cir. 2001). *See also In re Isbell Records, Inc.*, 774 F.3d 859, 867 (5th Cir. 2014) ("Since a Rule 50(b) motion 'is technically only a renewal of the [Rule 50(a) motion for judgment as a matter of law] . . . it cannot assert a ground that was not included in the [original] motion.'" (alterations in original) (quoting *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 172 (5th Cir. 1985))); *Arsement v. Spinnaker Expl. Co., LLC*, 400 F.3d 238, 247 (5th Cir. 2005) ("If a party fails to raise an issue in its Rule 50(a)(1) motions at trial, it may not do so in its post-trial Rule 50(b) motion.").

## B.   HHA's Argument that the Contents of Miniex's Reporting Are Not Protected Is Forfeited and, Alternatively, Without Merit

### 1.   Applicable Standard

Under the FCA's anti-retaliation provision, an employer is prohibited from retaliating against an employee for any "lawful acts done . . . in furtherance of an [FCA] action . . . or other efforts to stop . . . violations of [the FCA]." 31 U.S.C. § 3730(h)(1). The parties agree that the FCA's scope of protection against

retaliation is governed by the "distinct possibility" standard.[112]   Under this standard, "an employee's actions must be aimed at matters that reasonably could lead to a viable claim under the Act," but the "employee need not 'have filed an FCA lawsuit or . . . have developed a winning claim at the time of the alleged retaliation.'"  *See U.S. ex rel. George v. Bos. Sci. Corp.*, 864 F. Supp. 2d 597, 604-05 (S.D. Tex. 2012) (quoting *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 236 (1st Cir. 2004)).   To satisfy this standard, the employee's actions must be motivated by a "good faith" and objectively reasonable belief—*i.e.*, "a reasonable employee in the same or similar circumstances might believe"—that her "employer is committing fraud against the government."  *See id.* at 605. *See also Thomas v. ITT Educ. Servs., Inc.*, 517 F. App'x 259, 263 (5th Cir. 2013) (per curiam) ("A protected activity is one motivated by a concern regarding fraud against the government.").

Miniex asserts that the contents of her reports to the Board, HUD-OIG, and the FBI are protected under the FCA because she reported that HCVP lacked effective "internal controls"—the omission of which could mask ongoing financial fraud and could lead to future fraud.  She also focuses on her recommendation that HHA retain a third party investigator to determine whether vouchers were being issued fraudulently on a systemic basis.[113]

---

[112]   Motion at 15; Response at 8.  The Fifth Circuit has never applied the "distinct possibility" standard.  Moreover, the authority district courts in the Southern District of Texas rely upon to support the distinct possibility standard predate Congress's 2009/2010 amendments to the FCA.  Nevertheless, at both parties' behest, the Court applies the distinct possibility standard to determine whether Miniex engaged in protected activity.

[113]   Trial Tr. 6 at 19:19-20:17, 23:10-23.  Miniex also asserts that her reporting on Newland's fraud itself was protected.  Miniex, however, acknowledges that HHA did not retaliate against her merely for reporting Newland's fraud.  *Id.* at 20:9-17.

(continued…)

HHA responds that Miniex's reporting is not protected as a matter of law. First, HHA argues Miniex's reports amounted only to "personnel matters," specifically, a recommendation to terminate Patricia Doggett, Robin Walls, Mark Thiele for negligent supervision.  HHA also argues that, even if Miniex's reports addressed a lack of internal financial controls, a nexus between Miniex's reports and a viable, non-speculative FCA claim is required.  Miniex's reports, HHA argues, lack a requisite nexus to a viable FCA claim because her reports ultimately involved unsubstantiated allegations of fraud.

## 2.    Forfeiture of Arguments by HHA

The Court holds HHA's arguments are forfeited.  At the close of evidence, HHA moved for JMOL, raising three grounds, none of which were the argument now asserted.[114]   Importantly, HHA's only argument that Miniex's relevant reporting was not protected was because reporting was one of her job duties.  In its renewed motion for JMOL, by contrast, HHA argues the substantive contents of Miniex's reports are not protected by the FCA.  HHA did not argue at trial that *what* Miniex reported was not subject to the FCA's protections.  HHA's omission in its Rule 50(a) motion at trial precludes it from raising its new ground in its renewed motion for JMOL under Rule 50(b).  *See Isbell Records*, 774 F.3d at 867;

---

(continued…)
Instead, Miniex contends she was retaliated against for reporting on HCVP's lack of financial internal controls and quality control.  *Id.*

[114]   *Id.* at 68:13-14.  First, HHA argued that Miniex failed to demonstrate she engaged in protected activity because the trial evidence established that reporting fraud was generally part of her job duties.  *Id.* at 68:14-25.  Second and relatedly, HHA argued that it lacked notice of Miniex's protected activity because her relevant reporting was within the scope of her job duties.  *Id.* at 68:20-69:1.  Third, HHA argued that Miniex failed to demonstrate a nexus between her reporting and various alleged adverse actions against her.  *Id.* at 69:23-70:4.

*Arsement*, 400 F.3d at 247.   HHA's arguments are forfeited and not properly before the Court.  *See OneBeacon Ins. Co.*, 841 F.3d at 676; *Flowers*, 247 F.3d at 238.

### 3.     Merits of HHA's Rule 50(b) Arguments

Despite forfeiture, the Court addresses HHA's arguments for JMOL. These contentions lack merit.  The jury could reasonably have concluded that Miniex's reports had the requisite nexus to a viable FCA claim and were not merely about personnel matters.

Miniex's report recommended HHA terminate HCVP's management because, under their supervision, Newland perpetrated a fraudulent scheme. Believing Newland's fraudulent scheme involved more HHA employees than just Newland, Miniex recommended HHA hire a third party investigator to determine the scope of fraudulent activities.  The jury could reasonably have found that these two recommendations were "aimed at matters that reasonably could lead to a viable claim under the Act," even if no "winning claim" existed at the time she reported.  *See George*, 864 F. Supp. 2d at 605.  Indeed, HHA does not argue that systemic fraudulent sale of housing vouchers would not give rise to a viable FCA claim.

The jury reasonably could have concluded that Miniex, when she reported, had a good faith and objectively reasonable belief that staff at HHA could be continuing to commit fraud by misdirecting federal funds.[115]   To attempt to demonstrate Miniex was unreasonable in her belief that fraud might be systemic and widespread, HHA cites Katie Anderson's findings that HCVP management did not participate in Newland's scheme and were not aware of Newland's fraud.

---

[115]     HHA does not argue that Miniex lacked a good faith belief that fraud was ongoing in HCVP.

Even if the jury credited Anderson's findings, the jury could reasonably have concluded Miniex's belief that there might be ongoing fraud was reasonable at the time of her reporting.  Anderson herself testified that it was reasonable for Miniex to recommend a third party investigation into HCVP to determine whether there was ongoing fraud.[116]  At least two other HHA employees harbored suspicions that there may be ongoing fraud within HCVP.  First, Skalka testified that he was suspicious that a fraud cover-up was ongoing and had previously recommended an audit of the entire HCVP department.[117]  Second, Bryce advised Gunsolley that he should consider hiring a third party to investigate "whether vouchers are being issued fraudulently on a systemic basis" and acknowledged that "[t]wo incidents in such a short period of time certainly gives one pause as to just how widespread the problem may be."[118]

The jury also could have reasonably inferred that the reports exceeded mere "personnel" recommendations based on the report's recipients.  By reporting to HUD-OIG and the FBI—entities that investigate possible fraud on the federal government, not employer's personnel decisions—Miniex's conduct strongly suggests that she was "motivated by a concern regarding fraud against the government" and not mere personnel matters.  *See Thomas*, 517 F. App'x at 262.

HHA cites *U.S. ex rel. Patton v. Shaw Services, L.L.C.*, for the proposition that allegations of general misconduct are not protected.  *See* 418 F. App'x 366, 372 (5th Cir. 2011) (per curiam).  In *Patton*, the Fifth Circuit found that the substance of the employee's complaints concerned "allegedly unsafe or improper

---

[116]    Trial Tr. 5 at 281:14-282:13.

[117]    Trial Tr. 2 at 73:12-24, 87:20-88:2.

[118]    Bryce's June 20 Email to Gunsolley at 3.

construction methods, and not that [the employee] was concerned that [the employer] was defrauding the government." *See id.* Unlike *Patton*, where the employee's internal complaints lacked "any suggestion that [he] was attempting to expose illegality or fraud," *see id.*, Miniex's reporting expressly states that, based on the "seriousness" of the discovered "fraudulent activities," a third party should investigate to determine "whether vouchers are being issued fraudulently on a systemic basis" and "to determine how widespread the problem may be."[119] *Cf. Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994) (concluding an employee's reporting was not protected when he "never used the terms 'illegal,' 'unlawful,' or '*qui tam* action' in characterizing his concerns"). Because housing vouchers issued to unqualified individuals would involve misuse of federal funds, the jury could reasonably have concluded that Miniex's reports involved more than mere personnel recommendations or allegations of general misconduct. Miniex's reports in 2016 had the requisite nexus to a potentially viable FCA claim.

### C. The Jury Could Reasonably Have Concluded Miniex's Reporting to the Board and the FBI Were Outside the Scope of Her Job Duties and Gave HHA Notice of Her Protected Activity

The parties do not contest, for present purposes, that Miniex had the burden to demonstrate at least one of her protected activities was outside the scope of her job duties in order to demonstrate HHA had notice of her protected activities.[120]

---

[119]    Miniex's Cover Letter at 2.

[120]    Response at 11-12. In a pretrial ruling, the Court held that under the Fifth Circuit's decision in *Robertson*, Miniex had the burden to demonstrate her alleged protected activity fell outside the scope of her job duties. Memorandum and Order Adopting in Part and Overruling in Part Magistrate Judge's Recommendation [Doc. # 182]. Miniex has argued throughout the litigation that an FCA-retaliation plaintiff may satisfy *Robertson*'s standard without acting outside the scope of her
(continued…)

The jury found that the protected activities in which Miniex engaged were outside the scope of her job duties.[121]   HHA contends that, based on the trial evidence, no reasonable jury could reach this conclusion and therefore judgment as a matter of law is warranted.

The Court is unpersuaded.   The jury reasonably found that Miniex's reporting the HCVP matters was outside the scope of her job duties.   Miniex claims her reporting to the Board, to HUD-OIG, and to the FBI each were protected activities.   Based on the evidence and testimony at trial, the jury reasonably could have concluded that Miniex's direct reports to the Board and FBI were beyond the scope of her job duties.

First, the jury reasonably could have found that Miniex's reporting Newland's fraud directly to Board members, over Gunsolley's explicit instructions not to report these matters to the Board, was outside the scope of her job duties. Neither party has offered the Court a legal standard to determine what actions fall outside an employee's job duties for purposes of an FCA retaliation claim.   Nor has the Fifth Circuit provided guidance on the issue.   In *Robertson*, the seminal Fifth Circuit case requiring the plaintiff to show his protected activity was beyond his job duties to demonstrate his employer had knowledge of his protected activity,

---

(continued…)

job duties if her reports are specifically concerned with fraud or other illegal conduct.  Moreover, there is a substantial question regarding whether the 2009 and 2010 amendments to the FCA abrogate *Robertson*'s requirement that an FCA-retaliation plaintiff must act outside the scope of her job duties.   The Court rejected these arguments in its pretrial ruling.   Resolution of these legal questions is unnecessary here because the jury reasonably concluded Miniex's reporting was outside the scope of her job duties.

[121]     Verdict Form at 3.

the plaintiff admitted his fraud investigation was within "the normal course of his duties." *See* 32 F.3d at 952.

Other circuits with a similar requirement hold that an employee's failure to follow a supervisor's instructions or a departure from the ordinary chain of command creates a fact issue over whether his protected activity is outside the scope of his job duties. *See U.S. ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 908-09 (9th Cir. 2017) (holding that the plaintiff's "conversations outside of his chain of command regarding his concerns" could suggest the defendant had notice of his protected activity); *U.S. ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1240 (D.C. Cir. 2012) (holding that "[t]he company's termination letter indicating that [the plaintiff] was fired for failing to follow orders and the chain of command" may suffice to demonstrate that the plaintiff's actions were not part of her job duties); *U.S. ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1261 (D.C. Cir. 2004) (holding that the plaintiff's alerting of "a party outside the usual chain of command" may suffice "to notify the employer that the employee is engaged in protected activity").

In this case, the jury could have reasonably concluded that, by reporting the Newland matter directly to Board members, Miniex exceeded the scope of her job duties.  Gunsolley and Miniex's testimony at trial could reasonably support the conclusion that the normal procedure was for Miniex to bring her findings to Gunsolley and for Gunsolley, in turn, to report to the Board.[122]  While the evidence establishes Miniex would typically be present and available at Board meetings to answer Board members' questions,[123] HHA does not cite any trial evidence or

---

[122]  Trial Tr. 2 at 223:5-9; Trial Tr. 3 at 225:8-18; Trial Tr. 4 at 66:14-67:8, 142:4-19.

[123]  Trial Tr. 2 at 223:5-17; Trial Tr. 3 at 21:21-22:25; Trial Tr. 4 at 66:14-67:8.

testimony suggesting that Miniex made fraud reports without Gunsolley's approval or in contravention of Gunsolley's instructions not to make a report.[124]   Prior to the Newland matter, Gunsolley and Miniex had not had a conflict over a fraud investigation recommendation and Miniex had not previously asked to present a fraud investigation to the Board.[125]   During the Newland investigation, Miniex deviated from Gunsolley's directive not to discuss the matter with the Board and Gunsolley deemed Miniex's conduct as an insubordinate act.[126]   The jury could reasonably have concluded that by failing to follow Gunsolley's orders and going outside the typical chain of command, Miniex's reporting to the Board was outside the scope of her job duties.   *See Campie*, 862 F.3d at 908-09; *Schweizer*, 677 F.3d at 1240; *Williams*, 389 F.3d at 1261.

Second, the jury could also reasonably find that Miniex's meeting with the FBI, where she reported on Newland's (and, possibly, Radford's) fraud and conveyed information regarding the fraud investigation and Gunsolley's responses to her recommendations, was outside the scope of her job duties.   Miniex job duties included periodic meetings with HUD-OIG and she informed Gunsolley of these contacts.[127]   In connection with the HCVP matters, however, Miniex spoke with the FBI.   Miniex had never previously met with the FBI, and she did not disclose the fact or substance of that meeting with Gunsolley.[128]   The jury could

---

[124]   HHA contends that Miniex had an ethical obligation as an attorney to report to the Board.  Assuming this is the case, Miniex's independent ethical obligations does not govern the scope of her job duties, which are created and regulated by HHA.

[125]   Trial Tr. 2 at 223:10-22.

[126]   *Id.* at 222:22-25, 224:15-226:3; Trial Tr. 3 at 15:1-5; Trial Tr. 4 at 35:15-22.

[127]   Trial Tr. 2 at 75:2-4, 124:15-25, 125:6.

[128]   *Id.* at 95:11-21, 96:2-9, 97:10-12.

reasonably have concluded that Miniex's reports to FBI agents, which were meant to remain confidential, were outside the scope of her job duties at HHA.

HHA contends that HHA had no notice of Miniex's meetings with HUD-OIG and the FBI because the meetings remained confidential.  HHA's assertion is inconsistent with the evidence at trial.  Skalka testified that he told Bryce and Reaves, who in turn told Gunsolley, about the meeting at which Miniex disclosed the Newland matter to the FBI.[129]  Gunsolley testified that he learned of Miniex's meeting with HUD-OIG and the FBI through Reaves' and Bryce's memoranda and conversions with him on September 2, 2016.[130]

HHA further contends that because HUD-OIG and the FBI reached out to Miniex to set up the meetings, Miniex's fraud reporting to HUD-OIG and the FBI is not protected activity as a matter of law.  This argument is both forfeited and unpersuasive.  HHA did not raise this argument in its original motion for JMOL. *See OneBeacon Ins. Co.*, 841 F.3d at 676; *Flowers*, 247 F.3d at 238.  Additionally, HHA cites no authority to support the conclusion that reporting fraud at the request of an external entity prevents the action from being protected activity.   By reporting fraud, regardless of the fact that HUD-OIG requested the information, Miniex still engaged in an "effort[] to stop" an FCA violation.  *See* 31 U.S.C. § 3730(h)(1).

Because HHA's arguments in support of its renewed motion for JMOL are forfeited, meritless, or both, the Court **denies** HHA's request for JMOL.

---

[129]     *Id.* at 99:7-20.

[130]     *Id.* at 275:3-12.

## IV.   MOTION FOR NEW TRIAL

Under Federal Rule of Civil Procedure 59, a district court may "on motion, grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in any action at law in federal court."  FED. R. CIV. P. 59(a)(1).   HHA argues a new trial is appropriate for two reasons.  First, HHA contends that the Court erroneously instructed the jury on the essential elements of an FCA retaliation claim.  Second, HHA contends the jury's verdict that HHA retaliated against Miniex was against the great weight of the evidence. These arguments are forfeited, meritless, or both, and HHA's request for a new trial is **denied**.

### A.   The Court Properly Instructed the Jury on the Essential Elements of an FCA Retaliation Claim

#### 1.   Legal Standard

"[T]he trial court has great latitude in the framing and structure of jury instructions."  *Eastman Chem. Co. v. Plastipure, Inc.*, 775 F.3d 230, 240 (5th Cir. 2014).  "There are three requirements to successfully challenge jury instructions." *Taita Chem. Co., Ltd. v. Westlake Styrene, LP*, 351 F.3d 663, 667 (5th Cir. 2003).

> First, the appellant must show that viewing the charge as a whole, the charge creates 'substantial and ineradicable doubt whether the jury has been properly guided in its deliberations.'   Second, even if erroneous, the appellate court will not reverse if the error 'could not have affected the outcome of the case.'   Third, the appellant must show that the proposed instruction offered to the district court correctly stated the law.

*Id.*  (footnotes omitted) (quoting *F.D.I.C. v. Mijalis*, 15 F.3d 1314, 1318 (5th Cir. 1994)).  "[T]he trial court has great latitude in the framing and structure of jury instructions."  *Eastman Chem*, 775 F.3d at 240.  "[S]pecific jury instructions are to be judged not in isolation, 'but must be considered in the context of the instructions as a whole and the trial record.'"  *United States v. Phea*, 755 F.3d 255, 266 (5th Cir.

2014) (quoting *United States v. Simkanin*, 420 F.3d 397, 406 (5th Cir. 2005)).  "A litigant also must have preserved the error in the charge to complain on appeal." *Taita Chem.*, 351 F.3d at 667.

### 2.    HHA's Challenges to the Jury Instructions Are Forfeited or Lack Merit

HHA contends the Jury Instructions and Verdict Form contained several deficiencies.  First, HHA contends that the Jury Instructions erroneously omitted an instruction that Miniex cannot prevail unless she demonstrates she acted outside the scope of her job duties.  Second, HHA contends that the Court erroneously omitted the essential element of knowledge by HHA of Miniex's protected activity from the Verdict Form.  Third, HHA contends that the jury received an overbroad definition of protected activity in the Jury Instructions.  These three challenges are unpersuasive.

HHA's first objection is meritless.   While the Jury Instructions did not instruct the jury that Miniex could not prevail unless she acted outside the scope of her job duties, Question 2 in the Verdict Form asked whether the protected activities in which the jury found Miniex engaged were outside the scope of her job duties.[131]   The question was straightforward and required no instruction.  The jury responded "yes" to this question.[132]   In any event, "[v]erdict forms are considered part of the jury instruction, and [the Court] evaluate[s] the combined effect on the jury."  *United States v. Fairley*, 880 F.3d 198, 208 (5th Cir. 2018). Because the Jury Instructions and Verdict Form, when considered together, properly tasked the jury with deciding whether Miniex's protected activity, if any,

---

[131]    Verdict Form, Question 2.

[132]    *Id.*

was outside the scope of her job duties, there was no error in the jury instructions.[133]

HHA's second objection is also rejected.  The Court instructed the jury that an essential element of Miniex's FCA retaliation claim was that Gunsolley took an adverse employment action against Miniex "because of" her protected activity.[134] The Court instructed the Jury that in order to find Gunsolley took an adverse employment action against Miniex "because of" her protected activity, the jury "must find that when Gunsolley decided to take the adverse employment action he was aware that Miniex had engaged or was engaged in 'protected activity.'"[135] The jury thus was instructed, as a practical matter, that to find in favor of Miniex, it must find that Gunsolley knew of Miniex's protected activity when he took the relevant adverse employment action.   HHA's second objection to the jury instructions is unpersuasive.

HHA's third and final objection is forfeited and also without merit.  Quoting the relevant statutory language, the Court instructed the jury that a protected action under the FCA "is a lawful act done in furtherance of efforts to stop one or more violations of the [FCA.]"[136]  The Court defined "effort to stop" an FCA violation

---

[133]   HHA does not contend, and cannot contend, the Court failed to properly instruct the Jury on how to determine whether Miniex's protected activity fell outside her job duties.   HHA never offered an instruction, either pretrial or at the charge conference, describing the appropriate test.   During jury deliberations, the jury requested clarification regarding the meaning of "outside of Miniex's job duties." Jury Note 1 [Doc. # 230].  Without objection from HHA, the Court answered that "[t]his is a fact issue for the jury."  *Id.*

[134]   Jury Instructions at 10.

[135]   *Id.* at 12.

[136]   *Id.* at 10.

as "a conscious exertion of power designed to interrupt, prevent, or hinder a[n FCA] violation."[137]   The Court added that an action is only protected "if it was based on a good faith, reasonable belief that fraud possibly was being, or soon would be, committed against the United States government."[138]   HHA now contends this set of instructions was erroneous.   Relying on non-Fifth Circuit and district court authority, HHA argues that the Court should have instructed the jury that an employee's actions are protected only if the actions "reasonably could lead" to an FCA action.[139]   *See U.S. ex rel. Booker v. Pfizer, Inc.*, 847 F.3d 52, 59 (1st Cir. 2017); *O'Hara v. Nika Techs., Inc.*, 878 F.3d 470, 476 (4th Cir. 2017); *Campie*, 862 F.3d at 907; *U.S. ex rel. Ruscher v. Omnicare, Inc.*, No. 4:08-CV-3396, 2014 WL 2618158, at *23 (S.D. Tex. June 12, 2014).

This objection is forfeited.   While HHA now complains Court's definition of "protected activity" was in error, HHA did not submit any proposed jury instruction defining the term "protected activity."   HHA's failure to submit an alternative instruction precludes relief here.   *See* Fed. R. Civ. P. 51(d)(1)(B) ("A party may assign as error . . . a failure to give an instruction, if that party properly requested it and—unless the court rejected the request in a definitive ruling on the record—also properly objected."); *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 112 (2011) (refusing to consider argument that the district court erred by failing to give an instruction when the appellant "failed to request an instruction along these lines from" the district court); 9C CHARLES ALAN WRIGHT, FEDERAL PRACTICE

---

[137]   *Id.*

[138]   *Id.*   HHA has not objected to the insertion of "or soon would be" committed against the government.

[139]   *Id.*

AND PROCEDURE § 2252 (3d ed. 2008) ("As the plethora of decided cases make clear, it is difficult for the losing party to persuade the appellate court that the trial court erred in failing to instruct the jury on a particular matter if no instruction actually was requested by the complaining party.").

Moreover, HHA's belated alternative is not substantively different from the Court's formulation of the definition "protected activity."  Multiple cases that apply the "reasonably could lead" standard, including two decisions cited by HHA, recognize the standard is satisfied if, as the Court instructed in this case, the employee has a good faith, reasonable belief that the employer is committing fraud on the government.  *See Campie*, 862 F.3d at 908; *Hoyte v. Am. Nat. Red Cross*, 518 F.3d 61, 71 (D.C. Cir. 2008); *Schuhardt v. Wash. Univ.*, 390 F.3d 563, 567 (8th Cir. 2004); *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir. 2004); *Ruscher*, 2014 WL 2618158, at *23.  HHA fails to articulate how the Court's omission of the "reasonably could lead" formulation in favor of the "good faith, reasonable belief" phrasing creates "substantial and ineradicable doubt" that the jury was properly instructed in light of the interchangeable nature of the two formulations.  *See Taita Chem. Co.*, 351 F.3d at 667.

HHA fails to demonstrate the Court erroneously instructed the jury.

## B.   The Jury's Finding that HHA Retaliated Against Miniex for Her Protected Activity Was Not Against the Great Weight of the Evidence

### 1.   Legal Standard

"[A] motion for a new trial based on evidentiary grounds should not be granted unless, at a minimum, the verdict is against the great weight of the evidence, not merely against the preponderance of the evidence." *Songcharoen v. Plastic & Hand Surgery Assocs., P.L.L.C.*, 561 F. App'x 327, 337 (5th Cir. 2014) (per curiam) (quoting *Carter v. Fenner*, 136 F.3d 1000, 1010 (5th Cir. 1998)).

*Accord Dahlen v. Gulf Crews, Inc.*, 281 F.3d 487, 497 (5th Cir. 2002). "Against the great weight of the evidence is a standard not easily met." *Scott v Monsanto Co.*, 868 F.2d 786, 789 (5th Cir. 1989). A jury's finding is rarely against the great weight of the evidence when much of the relevant evidence is testimonial and in direct conflict—*i.e.*, a "swearing match." *See Peterson v. Wilson*, 141 F.3d 573, 579 (5th Cir. 1998). Whether to grant a motion for new trial is within the district court's sound discretion. *See OneBeacon Ins. Co.*, 841 F.3d at 676. "The district court abuses its discretion by denying a new trial only when there is an 'absolute absence of evidence to support the jury's verdict.'" *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881 (5th Cir. 2013) (quoting *Seidman v. Am. Airlines, Inc.*, 923 F.2d 1134, 1140 (5th Cir. 1991)).

### 2. The Jury's Finding of Retaliation Was Not Against the Great Weight of the Evidence

HHA contends the jury's finding that HHA retaliated against Miniex for her protected activity is against the great weight of the evidence. Specifically, HHA contends Miniex failed to rebut HHA's legitimate non-discriminatory reasons for terminating her employment—unscheduled absences, tardiness, slowing down work, and disengagement. HHA contends Miniex's only evidence of pretext is the close temporal proximity between Gunsolley's discovery of her reporting and her discipline and termination. HHA argues that temporal proximity alone is inadequate as a matter of law to support a jury finding of retaliation. *See Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007) ("[Plaintiff] is left with no evidence of retaliation save temporal proximity. Again, temporal proximity alone is insufficient to prove but for causation."). HHA further contends that its adherence to internal procedures when disciplining and terminating Miniex reveal that its stated reasons for Miniex's termination were not pretextual.

The Court is unpersuaded.   Initially, HHA requests the Court apply an improper causation formulation.   An FCA retaliation plaintiff must demonstrate her protected activities "were the but-for cause" of her employer's adverse actions. *See U.S. ex rel. King v. Solvay Pharm., Inc.*, 871 F.3d 318, 333 (5th Cir. 2017).   At the summary judgment phase, courts in the Fifth Circuit analyze FCA retaliation claims under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).   *See Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 172, 175 & n.3 (5th Cir. 2016).   Where, as here, there has been a trial on the merits, courts proceed directly "to the ultimate question" of whether the plaintiff presented enough evidence for a reasonable jury to find that retaliation occurred.   *See Thomas v. Tex. Dep't of Criminal Justice*, 220 F.3d 389, 393 (5th Cir. 2000).   Courts "need not parse the evidence into discrete segments corresponding to a prima facie case, an articulation of a legitimate, nondiscriminatory reason for the employer's decision, and a showing of pretext." *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 476 (5th Cir. 2005) (quoting *Vaughn v. Sabine County*, 104 F. App'x 980, 982 (5th Cir. 2004)).   Rather, "[w]hen a case has been fully tried on the merits, the adequacy of a party's showing at any particular stage of the *McDonnell Douglas* ritual is unimportant." *Id.* (quoting *Vaughn*, 104 F. App'x at 982).

The Court concludes that it was not against the great weight of the evidence for the jury to determine that, but for her protected activity, Miniex would not have been disciplined or terminated.   HHA's assertion that the jury's finding of causation is supported by only temporal proximity is not accurate.   First, Miniex presented substantial direct and circumstantial evidence of Gunsolley's retaliatory motives.   Gunsolley stressed to Miniex when she started that he just wanted her to

"keep [him] out of the news."[140]  Miniex reported to the Board, HUD-OIG, and the
FBI during the summer of 2016, at a time when Gunsolley's contract with HHA
was being reevaluated *and* HHA was the subject of an agency-wide audit by
HUD.[141]  Gunsolley testified that he was angered by Miniex's June 22, 2016, email
where she reiterated her desire to directly report the Newland matter to the
Board.[142]  Gunsolley admitted that he drafted an email in response to Miniex's
June 22 email that he never sent (and was never produced during discovery) that
would have ended Miniex's employment.[143]   The Jury was entitled to find
Gunsolley's draft expressed his true feeling about Miniex's conduct and his desire
to end Miniex's employment.  Gunsolley admitted that it "really ticked [him] off"
when he learned that Miniex reported directly to the Board.[144]  The jury could have
reasonably believed Gunsolley was upset because implications of fraud by HHA's
general counsel would be harmful to his contract renewal prospects.  This direct
and circumstantial evidence of Gunsolley's motivations and reactions supports the
jury's finding that retaliation was a "but for" cause for Miniex's discipline and
termination.  *Cf. Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 547 F.

---

[140]    Trial Tr. 3 at 256:3-13.

[141]    *Id.* at 12:3-25.

[142]    In a footnote, HHA states that Miniex's abusive language towards Gunsolley in
her June 22, 2016, email "alone *would have* sustained a legitimate employment
termination."   Motion at 29 n.14 (emphasis added).   HHA, however, does not
appear to offer Miniex's abusive language as an actual reason for her discipline or
termination.   Moreover, Gunsolley did not cite Miniex's abusive language as a
reason for her discipline in either his September 8, 2016 write up or in his
December 9, 2016 termination letter.

[143]    Trial Tr. 2 at 236:16-237:1, 14-18.

[144]    *Id.* at 234:3-21.

App'x 484, 490 (5th Cir. 2013) (per curiam) (noting that testimony that the employee's supervisor was "mad" that the employee filed an EEOC charge "may suggest that a retaliatory motive was a factor" in the employee's termination, but ultimately holding that this fact by itself "does not create a genuine issue of material fact on the question whether but-for [the employer's] possible retaliatory motive, [the employee] would not have been terminated"); *Martin v. J.A.M. Distrib. Co.*, 674 F. Supp. 2d 822, 845 (E.D. Tex. 2009) (noting that a supervisor's admission that the employee "really pissed [him] off by accusing [him] of discriminating against him" suggested that the employer harbored a retaliatory animus).

Second, the jury could have reasonably concluded that Gunsolley made veiled threats of retaliation towards Miniex on multiple occasions.  During their June 21, 2016, meeting where Miniex asked Gunsolley to let her bring her recommendations to the Board, he requested Miniex be a "team player" and asked her whether she was "happy working at HHA" and "liked her job."[145]   In the Verbal Written Warning, Gunsolley told Miniex to resolve her issues regarding the VASH investigation and "get on the team and be a team player."  The jury could

---

[145]    Trial Tr. 2 at 237:10-12, 244:3-8.  *See* Email dated June 22, 2016, from Karen Miniex to Tory Gunsolley ("Miniex's June 22 Email") [Doc. # 236-25], at 2.  The jury was entitled to disbelieve Gunsolley's explanation for these statements, namely, that Miniex just did not seem happy.  *See* Trial Tr. 3 at 18:24-19:5. Gunsolley testified that while Miniex was on leave from January to May 2016, he did not "communicate with her much."  Trial Tr. 3 at 19:17-20.  Miniex testified that up until the Newland matter, she was happy with her job.  Trial Tr. 4 at 95:1-12.  The June 21, 2016, meeting was the first time Gunsolley raised the issue of Miniex's happiness.  Trial Tr. 3 at 20:10-15.  Gunsolley failed to point to any contemporaneous documentation evidencing that Miniex was disengaged from her work or unhappy at that time.  *Id.* at 19:25-20:11.  Instead, Miniex had repeatedly received positive performance reviews and raises.

have reasonably construed these statements as veiled threats and evidence of Gunsolley's retaliatory motive. *Cf. Costa v. Sears Home Imp. Prods., Inc.*, 65 F. Supp. 3d 333, 351, 353-54 (W.D.N.Y. 2014) (declining to grant summary judgment based in part on supervisors' veiled threats, including request that the plaintiff "be a team player" following her protected activity); *Campanella v. County of Monroe*, 853 F. Supp. 2d 364, 376 (W.D.N.Y. 2012) (holding that a supervisor's statement that the plaintiffs' protected activities "would create a 'problem' for plaintiffs" could reasonably be interpreted as some evidence of retaliatory animus); *Meckenberg v. N.Y.C. Off-Track Betting*, 42 F. Supp. 2d 359, 382 (S.D.N.Y. 1999) (treating threatening remarks made in response to protected activity as "circumstantial, if not direct, evidence of retaliatory animus").[146]

Third, the jury's finding of causality is supported by Gunsolley's prompt change in his treatment of Miniex immediately after he learned of one of Miniex's protected actions.  Gunsolley imposed his first formal disciplinary action, the Written Verbal Warning, on Miniex on September 8, 2016, the day following his receipt of Bryce and Reaves's memoranda stating that Miniex had discussed the Radford and Newland matters with the FBI.  Before the Written Verbal Warning, Miniex had four consecutive years of positive reviews and raises, and HHA cites no negative comments by superiors. *Cf. King*, 871 F.3d at 334 (stating the

---

[146]   Gunsolley's statements themselves did not constitute adverse employment actions. *Cf. Edison v. Avalon Corr. Servs., Inc.*, No. CV H-16-683, 2018 WL 4119637, at *8 (S.D. Tex. Aug. 29, 2018) (noting that "*unrealized* verbal threats" cannot support an actionable § 1983 retaliation claim (emphasis added)); *Brooks v. Hous. Indep. Sch. Dist.*, 86 F. Supp. 3d 577, 586 (S.D. Tex. 2015) ("Threats of retaliation that do not significantly alter conditions of employment are generally not enough for a prima facie Title VII case.").  Rather, these statements could be viewed as corroborating evidence that later adverse employment actions against Miniex were in retaliation for her protected activities.

summary judgment standard "can be met when 'the plaintiff had highly positive performance reviews up until the complaint was leveled against the company, and then suffered a sharp decline in treatment immediately after the protected conduct occurred'" (quoting *Khalfani v. Balfour Beatty Cmtys., L.L.C.*, 595 F. App'x 363, 366 (5th Cir. 2014) (per curiam))).

Fourth, based on the conflicting trial evidence, the jury could have reasonably concluded Gunsolley's stated reasons for Miniex's discipline and termination—Miniex's unscheduled absences, tardies, productivity concerns, and disengagement—were pretextual.[147]  To establish pretext, an employee must show her employer's "proffered explanation is false or 'unworthy of credence.'" *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).  This involves evidence "challenging the substance of violations, *i.e.*, evidence demonstrating their falsity" or "other evidence that undermines the overall credibility of [the employer's] proffered justification." *Id.* at 580.

The jury could have reasonably concluded that Gunsolley's productivity and disengagement allegations against Miniex were substantively false in whole or in part, or were not credible or were exaggerated.  Three HHA employees or former employees testified Miniex was a good employee who remained engaged throughout her time at HHA.[148]  While other HHA employees testified that Miniex

---

[147]   HHA does not argue that Gunsolley had an honest but mistaken belief that these stated reasons were correct.

[148]   Skalka testified that Miniex was responsive and he had no complaints about their working relationship.  Trial Tr. 1 at 23:15-25.  Keyanna Gartin, one of Miniex's former employees, testified that Miniex was a good boss and remained engaged with her work up until Miniex's termination.  Trial Tr. 2 at 14:7-15:1.  Gartin testified that in mid-August 2016 the atmosphere in the legal department was normal, Miniex was available, Miniex continued to hold bi-weekly meetings, and

(continued…)

became unresponsive and disengaged in mid- or late-2016, the jury was entitled to resolve this conflict in the evidence in Miniex's favor. *See Peterson*, 141 F.3d at 579. When requested during discovery in this case, HHA admitted it lacked any documents suggesting Miniex's legal department underperformed in 2016.[149] At trial, Gunsolley admitted he could not recall any specific contracts Miniex held up or that HHA executives complained about.[150] *Cf. Laxton*, 333 F.3d at 580 (concluding a jury could reasonably find pretext when the employer "produced no contemporaneous written documentation of any employee complaints"). Notably, Gunsolley failed to provide specific examples orally or in his Verbal Written Warning of Miniex's underperformance or disengagement. This omission undermines Gunsolley's assertion that the Warning's purpose was corrective. *Cf. id.* (concluding a jury could reasonably conclude the employer was not genuinely concerned with the employee's alleged performance-related problems because the employer only discussed a single complaint with her and did not discuss problems the employer later contended were of particular concern to it). Gunsolley admitted the only employees in the legal department he interviewed before issuing the Written Verbal Warning were Bryce and Reaves, even though

---

(continued…)

there were no noticeable changes in her management behavior. *Id.* at 17:14-23, 27:6-18, 28:12-16. Gartin further testified that Miniex typically arrived on time and, based on the office layout, it would have been difficult for either Bryce or Reaves to monitor Miniex's arrival to and departure from the office. *Id.* at 32:13-15, 33:19-23, 34:3-35:20. Dianne Mitchell, HHA's Director of Human Resources, testified that she never had trouble reaching Miniex, that Miniex was responsive, that Miniex was enjoyable to work with, and that Mitchell had no complaints about Miniex. Trial Tr. 6 at 26:16-27:5.

[149]   Trial Tr. 2 at 271:9-12, 272:3-12.

[150]   *Id.* at 250:2-9; Trial Tr. 3 at 88:11-18; Trial Tr. 4 at 105:24-106:21.

some of their allegations related to issues other legal department employees would have been in a better position to address.[151]   Finally, Gunsolley omitted any reference to productivity and disengagement issues in his draft response to Miniex's September 13, 2016, grievance letter or in his November 29, 2016, meeting with Miniex when he suspended her.[152]   *See Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003) ("[O]ne can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision.").

There are multiple bases for the jury to have reasonably concluded that Gunsolley's assertions that Miniex was chronically tardy, routinely had unscheduled absences, and did not effectively communicate her absences and tardies, were pretextual.   Gunsolley based his September 8, 2016, Verbal Written Warning on his conclusion that for the preceding 12 months, Miniex had 15 unscheduled absences.[153]   To reach this conclusion, Gunsolley personally reviewed Miniex's email correspondence with him and Miniex's paid-time-off requests for

---

[151]   Trial Tr. 2 at 256:1-20, 257:3-6.   Miniex also impeached Reaves's credibility regarding Miniex's performance and attendance when he acknowledged he sought to replace her as General Counsel.   Trial Tr. 1 at 74:5-75:3.   The Court recognizes that "an improper investigation does not *establish* a discriminatory motive."   *See Medlock v. Ace Cash Exp., Inc.*, 589 F. App'x 707, 710 (5th Cir. 2014) (emphasis added) (citing *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005)).   Here, the Court does not conclude that Gunsolley's failure to interview members of the legal department beyond Bryce and Reaves "establish[es] a discriminatory motive."   *See id.*   Rather, the Court concludes that a jury could reasonably find Gunsolley's deficient investigation was one factor among many that weighs in favor of finding Miniex's discipline and termination were retaliatory.

[152]   Trial Tr. 3 at 98:11-22, 101:15-102:25.

[153]   *Id.*

the prior 12 months.[154]  Gunsolley deemed an absence unscheduled when Miniex gave less than 12 hours' notice.  In making his calculation that Miniex had 15 unscheduled absences, Gunsolley retrospectively counted Miniex's absences on less than 12 hours' notice as unscheduled, even though he had not contemporaneously denied these requests, nor ever chastised her for untimeliness. In fact, Gunsolley had never previously told Miniex she could not take time off or reprimanded her for her attendance, had not previously monitored other HHA executives' absences and tardies, and had never disciplined or terminated another HHA employee for unscheduled absences.[155]  Gunsolley based the 12 hours' notice standard on HHA's absence policy,[156] despite evidence that this policy did not apply to exempt employees like Miniex.[157]   Moreover, Gunsolley's review of Miniex's emails to him did not account for possibility that she called or texted him notice of an impending absence.[158]  There was also a substantial factual question at trial whether Gunsolley actually reviewed the Miniex's correspondence *before* the September 8 meeting.[159]

When Gunsolley suspended Miniex on November 29, 2016, and ultimately terminated her employment on December 9, 2016, the basis for his conclusion that

---

[154]    Trial Tr. 2 at 258:11-16, 259:24-260:6, 270:4-8.

[155]    Trial Tr. 3 at 54:4-55:21,70:22-71:4; Trial Tr. 4 at 109:4-8.

[156]    Trial Tr. 3 at 74:9-80:11.

[157]    *See* Trial Tr. 2 at 250:20-251:23, 252:2-5, 253:4-24.

[158]    Trial Tr. 4 at 109:9-23.

[159]    Trial Tr. 2 at 260:10-262:25; Trial Tr. 3 at 72:17-73:20.  Notably, Gunsolley did not present Miniex with any documentation of unscheduled absences at the September 8 meeting.  Trial Tr. 3 at 81:16-19.

Miniex was habitually tardy and absent was not his personal calculation of Miniex's attendance but solely Bryce's calendar.[160]   Gunsolley admitted he never verified the time entries on Bryce's calendar by cross-checking it against his email correspondence with Miniex.[161]   Moreover, the jury could have reasonably questioned the calendar's veracity given Bryce allegedly monitored Miniex for over two years without raising the issue with any superior at HHA.[162]

Finally, Gunsolley, in contravention of HHA's standard practice, did not consult Human Resources staff when computing Miniex's missed time.  Nor did he involve Human Resources in Miniex's disciplinary and termination process.[163] Based on the evidence and testimony at trial, the jury reasonably could have concluded that Gunsolley's assertions that Miniex was routinely tardy or had excessive unscheduled absences were not credible and were not the actual basis for his decision to terminate her employment.

The jury's conclusion that HHA disciplined and terminated Miniex because of her fraud reporting was not against the great weight of the evidence.  A new trial based on HHA's evidentiary challenge is unwarranted.

## V.   **DAMAGES**

The jury found Miniex suffered $370,571 in lost back pay, $600,000 in lost front pay, and $317,750 and $215,000 in past and future mental anguish damages, respectively.   The Court entered judgment on that verdict, awarding Miniex

---

[160]    Trial Tr. 2 at 280:17-281:19, 283:16-18.

[161]    *Id.* at 270:11-271:2.

[162]    *See id.* at 246:20-247:12, 248:24-249:6.

[163]    Trial Tr. 6 at 38:7-40:4, 41:2-19.

$741,502 in back pay,[164] $46,786.16 in pre-judgment interest on back pay, as well as the jury's figures on front pay and mental anguish.[165]

HHA contends the jury's wage and noneconomic damages awards are excessive and unsupported by the evidence introduced at trial.[166]   HHA argues Miniex's back pay and front pay awards should be reduced to account for Miniex's failure to mitigate her damages.   HHA further argues that Miniex's noneconomic damages should be eliminated or remitted because they are unsupported by sufficient evidence and are excessive relative to analogous Fifth Circuit cases.

The Court is unpersuaded that Miniex's back pay award is excessive.   The Court concludes that HHA's evidence at trial was insufficient to meet its burden to show Miniex failed to mitigate her damages or that the back pay awarded by the jury was excessive.

The Court concludes, on the other hand, that a front pay award of $600,000 is an unwarranted windfall.   Such an award depends on a pair of unjustified assumptions: first, that but for her December 2016 termination Miniex would have remained employed at HHA for another eight years; and second, that Miniex will remain underemployed as a contract attorney making substantially less than her salary at HHA.   The Court instead finds, in the exercise of its discretion, that a reasonable front pay award is $216,861. Such an award compensates Miniex as though she remained employed at HHA until December 2020, which is four years

---

[164]   Pursuant to 31 U.S.C. § 3730(h)(2), the Court doubled the jury's back pay award of $370,571.00.  Memorandum and Order dated April 17, 2019 [Doc. # 241], at 9.

[165]   Final Judgment at 1.

[166]   Motion at 31.

after the date of her December 2016 termination.  Accordingly, the Court amends its judgment to reduce Miniex's front pay award from $600,000 to $216,861.

The Court further concludes that Miniex's noneconomic damage awards are excessive relative to past awards in factually similar cases.  Accordingly, the Court grants HHA's request for remittitur and will require Miniex to elect between lowering her past noneconomic damages to $217,070.34 and a new trial.  Last, the Court concludes there is insufficient evidence to support an award of future noneconomic damages and downwardly amends Miniex's future noneconomic damages award to the nominal sum of $100.

### A.    Available Remedies Under the FCA

Under the FCA, an employee who suffers retaliation for activity protected by the FCA is entitled to "all relief necessary to make that employee . . . whole." *See* 31 U.S.C. § 3730(h)(1).  This includes reinstatement, double back pay, interest on the back pay, and compensation for "special damages."  *See id.* § 3730(h)(2). When reinstatement is not feasible, as is the case here based on stipulation of the parties, the plaintiff is entitled to front pay in lieu of reinstatement.  *Cf. Julian v. City of Houston*, 314 F.3d 721, 728 (5th Cir. 2002) (using front pay in lieu of reinstatement in the ADEA context).  "Special damages" under the FCA include damages for emotional distress, attorney fees, and costs.  *See Neal v. Honeywell, Inc.*, 191 F.3d 827, 831-34 (7th Cir. 1999).

### B.    Miniex's Wage Awards

#### 1.    Relevant Facts

To prove her wage-related damages, Miniex relied on her own testimony as well as that of her damages expert, Jeremy Robin.  Before her termination in December 2016, Miniex's annual compensation was $160,000 plus retirement and

other benefits worth $13,600 in present dollars.[167]   Miniex testified, without contradiction, that after her termination, she applied to between 150 to 175 other positions and received only two or three in-person interviews.[168]   Miniex did not obtain any employment in 2017, but did obtain some work in 2018 as a contract attorney making $25 an hour.[169]   Miniex presented evidence to the jury that, annualized, this wage for a forty-hour workweek amounts to $52,000 a year.[170] Miniex further explained that she has not been able to work as a solo practitioner because of the obligations of caring for her son and a lack of resources.[171] Miniex's expert calculated that Miniex's net lost wages and benefits to the date of the commencement of trial were $370,751.[172]

To calculate her future lost wages, Miniex's expert projected that, had Miniex not been retaliated against, Minex would have remained employed at HHA for ten years after the date of her termination and seven years and nine months after the date of trial.[173]   Miniex's expert opined that this was a conservative estimate because work-life expectancy tables projected that Miniex's work-life expectancy could be as long as 23 years.[174]   Relying on the assumption that Miniex

---

[167]   Trial Tr. 4 at 245:20-24.

[168]   *Id.* at 132:6-16.

[169]   *Id.* at 131:16-132:5, 135:22-25, 250:21-23, 251:9-22.

[170]   *Id.* at 253:1-9.

[171]   *Id.* at 134:1-13.

[172]   Summary of Data [Doc. # 237-8].

[173]   Trial Tr. 4 at 256:12-16.

[174]   *Id.* at 256:17-257:21.

would remain employed as a contract attorney making $52,000 a year, Miniex's expert calculated the net present value of her future lost wages and benefits over the next seven years and nine months until the end of 2026 was $916,354.[175]  The jury awarded Miniex $370,751 in back pay, which the Court doubled pursuant to 31 U.S.C. § 3730(h)(2), resulting in a final back pay award of $741,502.  The jury further awarded Miniex $600,000 in front pay, which, under Miniex's expert's model, is roughly equivalent to the front pay Miniex would receive had she continued to work at HHA until March 2024.[176]

## 2.   The Court Will Not Reduce Miniex's Back Pay Award

HHA contends that the jury's back pay award is excessive because Miniex failed to mitigate her damages by seeking and obtaining similar employment after her termination.  The Court is unpersuaded by HHA's mitigation argument.  The Court also concludes that the jury's past lost wage award is supported by adequate trial evidence and downward amendment of that award is not warranted.

### a.   Legal Standard for Back Pay

"[B]ack pay is an equitable remedy, the award of which [is] review[ed] for abuse of discretion."  *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 492 (5th Cir. 2001).  "Because it is an equitable remedy, back pay is subject to a duty to mitigate damages."  *Id.*  "The employer has the burden of proving a failure to mitigate, and may do so by demonstrating that substantially equivalent work was available and that the plaintiff did not exercise reasonable diligence to obtain it."[177]  *Buckingham*

---

[175]   *Id.* at 257:22-257:10.

[176]   *See* Summary of Data [Doc. # 237-8].

[177]   The federal jurisprudence regarding an employee's duty to mitigate her damages largely arises from Title VII discrimination and retaliation claims.  Title VII, unlike the FCA, imposes a statutory duty to mitigate damages upon employees.

(continued…)

*v. Booz Allen Hamilton, Inc.*, 64 F. Supp. 3d 981, 984 (S.D. Tex. 2014) (citing *Sellers v. Delgado College*, 902 F.2d 1189, 1193 (5th Cir. 1990), and *Huffman v. City of Conroe*, No. H-07-1964, 2009 WL 361413, at *14 (S.D. Tex. Feb. 11, 2009)).[178]

---

(continued…)
*See Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 935 (5th Cir. 1996) (acknowledging that the Title VII duty to mitigate arises out of the statute and does not directly apply to other statutory causes of action), *abrogated on other grounds, Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 156 F.3d 581, 593 (5th Cir. 1998).  While the FCA imposes no statutory duty to mitigate damages, the Supreme Court has recognized that Title VII's statutorily imposed "duty to avoid or mitigate harm reflects an equally obvious policy imported from the general theory of damages, that a victim has a duty 'to use such means as are reasonable under the circumstances to avoid or minimize the damages.'"  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 806 (1998) (quoting *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231, n.15 (1982)).  Accordingly, multiple courts have permitted employers to assert mitigation of damages defenses against FCA retaliation claims.  *See Townsend v. Bayer Corp.*, 774 F.3d 446, 466 (8th Cir. 2014); *Wilkins v. St. Louis Hous. Auth.*, 198 F. Supp. 2d 1080, 1092 (E.D. Mo. 2001), *aff'd*, 314 F.3d 927 (8th Cir. 2002).  *Cf. Garcia v. Harris County*, No. CV H-16-2134, 2019 WL 132382, at *2 n.1 (S.D. Tex. Jan. 8, 2019) ("[T]he court looks to Title VII case law as guidance in determining the requirements for a duty to mitigate defense in a First Amendment employment retaliation context.").

[178]  Recent Fifth Circuit decisions state that if an employer proves the employee has not exercised reasonable diligence in seeking out new employment, it need not show the availability of substantially equivalent employment.  *See Jackson v. Host Int'l, Inc.*, 426 F. App'x 215, 222 (5th Cir. 2011) (per curiam); *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 393 (5th Cir. 2003); *Sellers*, 902 F.2d at 1193. These recent decisions, however, conflict with prior Fifth Circuit authority requiring employers to prove *both* elements of its failure to mitigate defense.  *See Sparks v. Griffin*, 460 F.2d 433, 443 (5th Cir. 1972).  Under the Fifth Circuit's rule of orderliness, "one panel . . . cannot overrule the decision of another panel."  *See United States v. Dial*, 542 F.3d 1059, 1060 (5th Cir. 2008) (per curiam) (quoting *Lowrey v. Tex. A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997)).  Because a subsequent Fifth Circuit panel cannot overrule a prior Fifth Circuit holding without an *en banc* decision, this Court adheres to the earlier ruling in *Sparks*.  *See Garcia*, 2019 WL 132382, at *2 (noting the conflict of Fifth Circuit authority and
(continued…)

### b.    The Jury's Back Pay Award Was Not Unreasonable

HHA fails to demonstrate that Miniex did not exercise reasonable diligence in the period between her termination and trial.   HHA did not contest Miniex's testimony that she applied for between 150 to 175 other positions over a roughly one-and-a-half-year period and received only two or three in-person interviews and no job offers.[179]  *Cf. Sellers*, 902 F.2d at 1194-95 (holding the plaintiff failed to exercise reasonable diligence when she applied for only 27 jobs over three years and the employer introduced 290 classified advertisements for substantially equivalent jobs); *Benson v. Thompson Cadillac-Oldsmobile, Inc.*, 287 F. App'x 249, 255 (4th Cir. 2008) (per curiam) (holding the plaintiff exercised reasonable diligence when he applied for 82 separate positions over an 11 month period). While HHA's damages expert opined that this was actually a low number of interviews given the length of time Miniex was unemployed,[180] the jury could reasonably disagree with his opinion based on the lack of specificity of the testimony and common experience.

Moreover, HHA does not cite any trial evidence or testimony suggesting that "substantially equivalent work was available" to Miniex.  *See Buckingham*, 64 F. Supp. 3d at 984.   "Substantially equivalent work" is that "employment which

---

(continued…)

applying *Sparks*); *Buckingham*, 64 F. Supp. 3d at 985 (same); *Little v. Tech. Specialty Prods. LLC*, No. 4:11-CV-717, 2014 WL 1116895, at *3 (E.D. Tex. Mar. 18, 2014) (Mazzant, M.J.) (same); *Paulissen v. MEI Techs., Inc.*, 942 F. Supp. 2d 658, 677 (S.D. Tex. 2013) (same); *Huffman v. City of Conroe*, No. CIV.A. H-07-1964, 2009 WL 361413, at *13 n.37 (S.D. Tex. Feb. 11, 2009) (same).

[179]    Trial Tr. 4 at 132:6-16.

[180]    Trial Tr. 5 at 17:4-12.

affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which" the plaintiff was terminated. *See Sellers*, 902 F.2d at 1193. HHA relies on its non-lawyer damages expert's testimony that, based on Bureau of Labor Statistics information, a person with Miniex's experience who had also graduated from a "top 10" law school should have been able to acquire a higher paying job than contract work within 12 to 39 weeks of her termination.[181] This testimony does not establish that the other jobs Miniex could have acquired in the past, under *Sellers*, would be "substantially equivalent work" to her position as general counsel of HHA. *See* 902 F.2d at 1193. Accordingly, HHA has not demonstrated that the jury's back wage award figure is excessive.

### 3. The Court Downwardly Amends Miniex's Front Pay Award
#### a. Legal Standard for Front Pay

"A front pay award rests within the court's equitable discretion." *Miller v. Raytheon Co.*, 716 F.3d 138, 146 (5th Cir. 2013). "Although front pay is an equitable remedy for the district court to determine, the court may empanel an advisory jury." *Mota v. Univ. of Tex. Hous. Health Sci. Ctr.*, 261 F.3d 512, 526 (5th Cir. 2001). The Court informed the parties it would empanel an advisory jury on the front pay issue and did so.

"Front pay is awarded to compensate the plaintiff for lost future wages and benefits." *Rutherford v. Harris County*, 197 F.3d 173, 188 (5th Cir. 1999) (quoting *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir. 1992)). "[A]lthough [the Fifth Circuit] will generally accord 'wide latitude' to the district courts in the determination of front pay, [the Circuit] ha[s] also emphasized that such awards

---

[181]    Motion at 32-34; Trial Tr. 5 at 15:15-17:3, 18:11-17.

must be carefully crafted to avoid a windfall to the plaintiff." *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 491 (5th Cir. 2007) (quoting *Deloach v. Delchamps, Inc.*, 897 F.2d 815, at 822 (5th Cir. 1990)).

"Front pay can only be calculated through intelligent guesswork, and [the Fifth Circuit] recognize[s] its speculative character by according wide latitude in its determination to the district courts." *Downey v. Strain*, 510 F.3d 534, 544 (5th Cir. 2007) (quoting *Sellers*, 781 F.2d at 505). The Fifth Circuit has identified six factors relevant to the determination of a front pay award: "(1) the length of prior employment, (2) the permanency of the position held, (3) the nature of the work, (4) the age and physical condition of the employee, (5) possible consolidation of jobs, and (6) the myriad other non-discriminatory factors which could validly affect the employer/employee relationship." *Id.* (citing *Reneau v. Wayne Griffin & Sons, Inc.*, 945 F.2d 869, 871 (5th Cir. 1991)). Moreover, the Fifth Circuit has recognized that a front pay award "should reflect earnings in mitigation of damages" and "district courts 'must consider [a plaintiff's] failure to mitigate . . . damages in determining the extent to which, if at all, front pay is appropriate.'" *Giles*, 245 F.3d at 489 (quoting *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 937 (5th Cir. 1996), and *Hansard v. Pepsi-Cola Metro. Bottling Co.*, 865 F.2d 1461, 1470 (5th Cir. 1989)).

### b. The Court Downwardly Amends Miniex's Front Pay Award to $216,861

Based on the trial evidence and testimony, the Court concludes that a front pay award of $600,000 is excessive. According to Miniex's expert's model, a front pay award of $600,000 is roughly equivalent to the pay and benefits Miniex would receive if she continued to work at HHA until March 2024.[182] As front pay

---

[182]   *See* Summary of Data.

is an equitable remedy, in lieu of reinstatement, the Court has responsibility to make its own finding.  The Court finds that the jury's projection of future lost pay is without support and is unrealistic.  The Court holds that an award of front pay through the end of 2020—roughly four years from Miniex's termination from HHA and one year and nine months after trial—is warranted.  The Court thus downwardly amends Miniex's front pay award to $216,861.

Several factors support the Court's conclusion.  First, Miniex was an at-will employee that had been employed at HHA for less than five years at the time of her termination.  *Cf. Downey*, 510 F.3d at 544 (upholding front pay award of two years when the plaintiff had been employed with the defendant for 18 years); *Julian v. City of Houston*, 314 F.3d 721, 729 (5th Cir. 2002) (holding that while at-will employees are not barred from recovering front pay, at-will status is a "factor for the district court to consider").  Second, it is clear that HHA experiences relatively high employee turnover.  Miniex's successor was replaced roughly a year-and-a-half after he was appointed.[183]  Three HHA former employees testified they worked at HHA for less than six years (Bennett Reaves, 5 years; Keyanna Gartin, 4 years; Brian Gage, 6 years).[184]  Third, the doubling of Miniex's back pay award is an equitable factor warranting a smaller front pay award.  *See Julain*, 314 F.3d at 729-30 ("[T]his court has determined that a substantial liquidated damages award may render an additional award of front pay inappropriate or excessive.").  Fourth, given Miniex's credentials and the jury's vindication of her in this lawsuit, the Court finds it unlikely that she w be unable to mitigate her damages in the future by obtaining more lucrative employment than her contract attorney position

---

[183]     Trial Tr. 1 at 73:6-16.

[184]     *Id.*; Trial Tr. 2 at 6:13-14, 14:17-19; Trial Tr. 5 at 45:10-46:4.

by the end of 2020.  *Cf. Giles*, 245 F.3d at 489 (holding "district courts 'must consider [a plaintiff's] failure to mitigate . . . damages in determining the extent to which, if at all, front pay is appropriate'" (quoting *Hansard v. Pepsi-Cola Metro. Bottling Co.*, 865 F.2d 1461, 1470 (5th Cir. 1989))).   Finally, the inherently speculative nature of front pay warrants a smaller award to ensure Miniex does not receive a windfall.  *Cf. Downey*, 510 F.3d at 545 ("[T]he district court did not err in noting that the speculative nature of front pay factored into its decision to award two years of front pay.").

While the aforementioned factors weigh against awarding Miniex an extended period of front pay, the Court nevertheless concludes that one year and nine months of front pay is warranted.  Miniex, until the events giving rise to this suit, was a valued employee and was happy with her job.[185]   Also, Miniex, as general counsel, held a position with unique responsibilities, rendering it less likely that she would be replaced in the ordinary course of HHA's operations.

Miniex cites a Fifth Circuit decision holding that an award of five years of front pay is "within the court's discretion."  *See Deloach*, 897 F.2d at 822.  This authority, however, does not suggest that a five-year front pay award is presumptively reasonable.   Rather, district courts, after conducting "intelligent guesswork," retain discretion to award a lesser amount.  *See Downey*, 510 F.3d at 544-45 (holding district court did not abuse discretion in awarding two years front pay).   For the foregoing reasons, the Court concludes a front pay award of $216,861, the net present value of Miniex's lost earnings and benefits had she remained employed at HHA until the end of 2020, is warranted.

---

[185]    Trial Tr. 4 at 54:14-55:17.

### C.      The Jury's Awards of Noneconomic Damages Are Excessive

### 1.      Relevant Facts

To prove her noneconomic damages, Miniex relied upon her own testimony and others' observations of her in mid- and late-2016.  Miniex testified that after her confrontation with Gunsolley in June 2016, she became unhappy, afraid, stressed, and "on edge."[186]  Miniex felt she was being watched and had to sit in her car before she entered the workplace in order to "steel" herself.[187]  She began seeing a psychiatrist in June 2016 to help with the anxiety.[188]  Miniex testified that after her termination, she continued to feel anxiety, which she attributed to her difficulty finding work, the damage to her professional reputation, and her financial precarity.[189]  Miniex is a single mother who supports her son and extended family.[190]  She testified that, since her termination, she exhausted her personal savings, retirement accounts, and college fund for her son.[191]  Miniex averred that she now relies on credit cards and has struggled to keep her home.[192] Brian Gage, an HHA witness who worked under Miniex in the legal department, testified that he began to develop concerns in June 2016 that Miniex was having a

---

[186]      *Id.* at 95:1-24.

[187]      *Id.* at 97:2-14.

[188]      *Id.* at 96:2-11.

[189]      *Id.* at 98:3-9, 136:2-12.

[190]      *Id.* at 98:3-9; Trial Tr. 3 at 250:20-251:1.

[191]      Trial Tr. 4 at 135:9-14.

[192]      *Id.* at 135:15-21.

"health issue" or that "something bigger" going on.[193]   The jury awarded Miniex $317,750 and $215,000 in past and future mental anguish damages, respectively.

### 2.   Legal Standard

"There is a strong presumption in favor of affirming a jury award of damages."   *Giles*, 245 F.3d at 488.   However, "[c]ompensatory damages for emotional distress and other intangible injuries are not presumed from the mere violation of . . . statutory rights, but require specific individualized proof, including how each Plaintiff was personally affected by the discriminatory conduct and the nature and extent of the harm."   *DeCorte v. Jordan*, 497 F.3d 433, 442 (5th Cir. 2007).   When a jury award of compensatory damages is "predicated exclusively on the plaintiff's testimony," the district court must "scrupulously analyze" the award.   *Brady v. Fort Bend County*, 145 F.3d 691, 719 (5th Cir. 1998).   "When a plaintiff's testimony is particularized and extensive, such that it speaks to the nature, extent, and duration of the claimed emotional harm in a manner that portrays a specific and discernable injury, then that testimony alone may be sufficient."   *Id.* at 720.   *See also Thomas v. Tex. Dep't of Criminal Justice*, 297 F.3d 361, 368 (5th Cir. 2002) (holding that the "two necessary elements for the plaintiff to recover emotional distress damages are "specific evidence of the nature and extent of the harm" and "more than vague allegations").   Once this Court determines that non-nominal damages for emotional distress are warranted, the Court reviews the size of the award "with deference" because "the harm is subjective and evaluating it depends considerably on the demeanor of witnesses."   *Giles*, 245 F.3d at 488 (quoting *Patterson*, 90 F.3d at 937-38).

---

[193]      Trial Tr. 5 at 72:23-25, 73:1-7.

C:\Users\SHELIA~1\AppData\Local\Temp\notes88842C\624MJMOLNTRemit.docx  190905.0923

"[W]hen a district court believes a verdict is excessive, it may condition a denial of a new trial on the plaintiff's filing a remittitur of a stated amount." *Evers v. Equifax, Inc.*, 650 F.2d 793, 797 (5th Cir. Unit B July 1981). Whether to grant remittitur is within the district court's sound discretion. *See Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 178 (5th Cir. 1992). The size of a remittitur is determined "in accordance with this circuit's 'maximum recovery rule.'" *See id.* (quoting *Hansen v. Johns-Manville Prods. Corp.*, 734 F.2d 1036, 1046 (5th Cir. 1984)).

Under the Fifth Circuit's "maximum recovery rule," this Court should not "reduce damages where the amount awarded is not disproportionate to at least one factually similar case from the relevant jurisdiction." *Lebron v. United States*, 279 F.3d 321, 325 (5th Cir. 2002) (quoting *Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336, 1339 (5th Cir. 1990)). The Court "measure[s] disproportionality by applying a percentage enhancement to past similar awards." *See Puga v. RCX Sols., Inc.*, 922 F.3d 285, 297 (5th Cir. 2019). "The rule allows some leeway, so it permits a verdict at 150% of the highest inflation-adjusted recovery in an analogous, published decision." *Longoria v. Hunter Express, Ltd.*, No. 17-41042, 2019 WL 3491785, at *3 (5th Cir. Aug. 1, 2019).

When a "review of the caselaw reveals that there is no factually similar case in the relevant jurisdiction[,] the maximum recovery rule is not implicated." *Foradori v. Harris*, 523 F.3d 477, 505 (5th Cir. 2008) (alteration in original) (quoting *Vogler v. Blackmore*, 352 F.3d 150, 158 (5th Cir. 2003)). "Because the facts of each case are different, prior damages awards are not always controlling; a departure from prior awards is merited 'if unique facts are present that are not reflected within the controlling caselaw.'" *Learmonth v. Sears, Roebuck & Co.*, 631 F.3d 724, 739 (5th Cir. 2011) (quoting *Lebron*, 279 F.3d at 326). In such cases, "the maximum recovery rule is not implicated" and the Court should "refuse to substitute [its] judgment for that of the jury." *Id.*

56

### 3.    Miniex's Maximum Recovery for Past Emotional Damages Is $217,070.34

The Court has already held that the trial evidence supports more than a nominal award of past noneconomic damages.[194]   The issue here is whether the jury's award of $317,750 in past noneconomic damages is excessive and should be remitted.   This analysis requires a survey of potentially comparable Fifth Circuit decisions affirming or ordering remittitur of emotional damage awards.[195]

In *Forsyth v. City of Dallas*, the Fifth Circuit upheld jury awards to two plaintiffs, respectively, of $100,000 and $75,000 for combined past and future emotional anguish.  *See* 91 F.3d 769, 772-73 (5th Cir. 1996).  There, plaintiffs, two veteran undercover detectives, sued the Dallas Police Department for retaliating against them in violation of the First Amendment and the Texas Whistleblower Act.  *Id.*  The $100,000 award was supported by one plaintiff's testimony that "she suffered depression, weight loss, intestinal troubles, and marital problems, that she

---

[194]    Memorandum and Order dated April 17, 2019 [Doc. # 241], at 9-11.

[195]    Miniex contends that the maximum recovery rule does not apply here because no Fifth Circuit case analyzes a jury award of mental anguish in an FCA retaliation case.  Response at 40.  Miniex's distinction is unpersuasive., First, the only FCA retaliation case Miniex cites analogizes the plaintiff's mental anguish to the mental anguish suffered by a Title VII plaintiff.  *See Townsend v. Bayer Corp.*, 774 F.3d 446, 467 (8th Cir. 2014) (citing *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 549, 551 (8th Cir. 2013)).  Further, the Fifth Circuit has analyzed and remitted jury awards in favor of Title VII discrimination and retaliation plaintiffs who were disciplined, terminated, and suffered from similar emotional symptoms as Miniex. There is no material distinction based on the statutory source of the cause of action as between a retaliation claim based on attempted enforcement of the FCA versus a retaliation claim under Title VII The Title VII cap on compensatory damages, *see* 42 U.S.C. § 1981a(b)(3), is not the origin of the maximum recovery rule, as demonstrated by non-Title VII cases where the maximum recovery rule is applied. *See, e.g., Puga*, 922 F.3d at 298 (applying maximum recovery rule in negligence case).

had been sent home from work because of her depression, and that she had to consult a psychologist because of the retaliation." *Id*. at 774. The $75,000 award was supported by the other plaintiff's testimony that "he suffered depression, sleeplessness, and martial problems." *Id.* Notably, neither plaintiff was awarded damages for lost wages. *Id.* at 773.

In *Vadie v. Mississippi State University*, the Fifth Circuit remitted an emotional distress award of $300,000 to $10,000 in a race discrimination case. *See* 218 F.3d 365, 378 (5th Cir. 2000). There, the plaintiff's only support for his emotional injury were his conclusory statements that his loss of promotion "destroyed" and "totally ruined him"; he became "sick, totally ill, physically, mentally, and everything"; he saw "many doctors" and took "many pills"; he could not "sleep for months," had headaches and nausea, and was under "severe doctor surveillance." *Id.* at 377.

In *Williams v. Trade Publishing Co.*, the Fifth Circuit upheld a jury award in a sex discrimination case of $100,000 for emotional distress. *See* 218 F.3d 481, 483, 486 (5th Cir. 2000) (per curiam). There, the plaintiff "testified specifically as to her severe emotional distress due to the discharge . . . resulting in sleep loss, beginning smoking and a severe loss of weight." *Id.* at 486. The plaintiff was further awarded $106,000 and $27,160 in back pay and front pay, respectively. *Id.* at 484.

In *Giles*, the Fifth Circuit remitted an emotional distress award of $300,000 to $150,000. *See* 245 F.3d at 489. There, the plaintiff sued for discrimination and retaliation under the Americans with Disabilities Act ("ADA") based on his termination. *Id.* at 479-80. The plaintiff recovered $141,110 in front pay, but no back pay. *Id.* at 489-90, 492-93. To support his emotional distress award, the plaintiff testified that he experienced trouble sleeping, headaches, and loss of prestige and social connections associated with his position. *Id.* at 488. The

58

plaintiff's symptoms were corroborated by a coworker, who testified that the plaintiff appeared "despondent, depressed, down and absolutely utterly discouraged about not being able to come back to work." *Id.*

In *Thomas*, the Fifth Circuit affirmed a $30,000 award of past emotional damages and remitted a $100,000 award of future emotional damages to $75,000. *See* 297 F.3d at 371-72. There, the plaintiff alleged her employer failed to promote her based on her sex, race, and in retaliation for her complaints to the Equal Employment Opportunity Commission ("EEOC"). *Id.* at 363. The plaintiff testified "to severe past emotional distress"—weeping, feelings of failure, isolation, and helplessness, depression, loss of sleep, nausea, and taking antidepressants. *Id.* at 370. Other witnesses corroborated the severity of the plaintiff's past emotional distress. *Id.* By the time of her trial, however, the plaintiff had been transferred to another unit, where she was happy, received favorable evaluations, and had been named employee of the month. *Id.* at 370-71. Moreover, the district court ordered the defendant to promote the plaintiff. *Id.* at 365. While the Circuit recognized that "[t]he evidence pointed to some ongoing and future emotional distress," it was "nothing as severe as what [she] suffered during the retaliatory period." *Id.* at 371. Based on the diminution in plaintiff's emotional suffering, the Circuit determined that "a reasonable jury could not have concluded that [the plaintiff's] future emotional distress will be over three times worse than the emotional harm she has already suffered." *Id.* Without relying on the guidance of another award of future emotional damages, the Circuit concluded that the jury properly could have awarded only $50,000, which adjusted for the maximum recovery rule, warranted a remittitur to $75,000. *Id.* at 371-72.

In *Salinas v. O'Neill*, the Fifth Circuit again remitted a noneconomic $300,000 jury award to $150,000. *See* 286 F.3d 827, 833 (5th Cir. 2002). There, the plaintiff sued under Title VII and the Age Discrimination in Employment Act

("ADEA"), alleging his employer failed to promote him because of his race, age, and in retaliation for filing a charge with the EEOC. *Id.* at 829. The plaintiff testified to his "high level of paranoia regarding further retaliation," using "lots" of sick leave, "visiting physicians more than seventy times," and his "deteriorating relations with his wife and son." *Id.* at 832. Moreover, the plaintiff's wife corroborated his testimony and the jury awarded the plaintiff $16,000 in medical expenses. *Id.* Nevertheless, the Fifth Circuit remitted the emotional damage award from $300,000 to $150,000. *Id.* at 833.[196]

The Court concludes that "the highest inflation-adjusted recovery in an analogous, published [Fifth Circuit] decision" is *Giles*, decided in 2001. *See Longoria*, 2019 WL 3491785, at *3. Both Miniex and the plaintiff in *Giles* suffered physical manifestations of emotional distress, which were corroborated by a coworker. Both plaintiffs' job losses were associated with lost prestige, social connections, and diminished future earnings. The *Giles* Court held that the plaintiff's maximum recovery was $150,000. Adjusted for inflation, the *Giles* plaintiff's recovery in 2019 dollars is $217,070.34.[197] The Court concludes that

---

[196]    In *Tureaud v. Grambling State Univ.*, the Fifth upheld a $140,000 in noneconomic damages award in a Title VII retaliation case. 294 F. App'x 909, 916 (5th Cir. 2008) (per curiam). There, the plaintiff testified "his discharge was 'emotionally embarrassing' and 'painful experience' that caused him to be 'deeply hurt," that "he gained 'quite a bit' of weight, was stressed, and 'had the blues' because of the discharge. *Id.* The Circuit further affirmed a back pay award of $187,000 and a $27,000 front pay award. *Id.* at 916 n.7. The Fifth Circuit declines to use unreported cases from the relevant jurisdiction as benchmarks for purposes of the maximum recovery rule. *See Lebron*, 279 F.3d at 326 (declining "to use unreported decisions as benchmarks and noting that the Fifth Circuit "has not previously considered unreported decisions when invoking the maximum recovery rule"). This Court, therefore, does not rely on *Tureaud* as a benchmark.

[197]    *See* U.S. Inflation Calculator, https://www.usinflationcalculator.com/.

Miniex's maximum recovery for her past emotional damages is $217,070.34, and Miniex must elect between consenting to a $100,679.66 remittitur of her $317,750 past noneconomic damages awards and holding a new trial.

### 4. Miniex Has Not Demonstrated Entitlement to More than Nominal Future Noneconomic Damages

The Court determines Miniex has failed to demonstrate entitlement to more than nominal future noneconomic damages. While Miniex introduced substantial evidence of her past emotional distress, Miniex failed to introduce "specific individualized proof" that she suffers from ongoing emotional distress. *See DeCorte*, 497 F.3d at 442. *Cf. Thomas*, 297 F.3d at 371-72 (ordering remittitur of future emotional damages because while "[t]he evidence pointed to some ongoing and future emotional distress," it was "nothing as severe as what [the plaintiff] suffered during the retaliatory period"). Because Miniex's proof of her future emotional damages is "predicated exclusively on [her own] testimony," the Court must "scrupulously analyze" the award. *See Brady*, 145 F.3d at 719.

Miniex's testimony as to her ongoing and future emotional distress falls short. Miniex did not testify in any detail as to how the retaliation she suffered in 2016 *currently* affects her. She did not specifically testify that she currently sees a psychiatrist, therapist, or other professional. Her only testimony regarding her emotional symptoms is that she continues to suffer "anxiety" because of her difficulties in finding work and her feeling that she had developed a "scarlet letter" because of her termination.[198] Miniex's testimony on her current and future emotional distress was not "extensive" and did not "speak[] to the nature, extent, and duration of the claim emotional harm." *See id.* at 720. The Court is not

---

[198]   Trial Tr. 4 at 136:1-12. Miniex does not argue that the damage to her professional reputation supports a future emotional distress award.

persuaded that a reasonable jury—in light of Miniex's vague and uncorroborated testimony, the passage of time, and the award of substantial back and front pay awards, even as modified by the Court in an exercise of its discretion—could conclude that Miniex will continue to suffer from emotional distress as a result of her 2016 termination. *Cf. Hitt v. Connell*, 301 F.3d 240, 251 (5th Cir. 2002) (vacating $224,000 non-pecuniary damages award when the plaintiff did not present medical evidence, corroborating testimony, or evidence of physical manifestations and the plaintiff's only evidence of his emotional damages was his testimony that his discharge "was emotionally trying," he was "depressed," "out of work," "embarrassed," "very defensive," and had "a blight" on his professional reputation); *Brady*, 145 F.3d at 720 (affirming judgment as a matter of law in favor of defendant on mental anguish award when the plaintiff's only evidence of his emotional distress was his "vague, conclusory, and uncorroborated" testimony that he had "sleeplessness," "nervousness," and "anxiety"). Accordingly, the Court downwardly amends Miniex's future emotional damage award to a nominal sum of $100.

## VI.    CONCLUSION AND ORDER

The jury was properly instructed and could reasonably find for Miniex on all essential elements of her FCA retaliation claim. Moreover, the jury's back pay award was supported by trial evidence and not excessive. The Court nevertheless concludes that the jury's award of $600,000 in front pay is excessive and will downwardly amend its judgment to award Miniex $216,861 in front pay. The Court future concludes Miniex's maximum recovery for her past noneconomic damages is $217,070.34 and that only a nominal award of $100 is appropriate for Miniex's future noneconomic damages. It is therefore

**ORDERED** that Defendant HHA's Renewed Motion for Judgment as a Matter of Law, or Alternatively, Motion for New Trial or Remittitur [Doc. # 257]

is **DENIED in major part** and **GRANTED in part**.  The Court **AMENDS** its Final Judgment [Doc. # 242] to award Miniex $216,861 in front pay and $100 in future noneconomic damages.  Miniex must elect on or before **September 20, 2019,** between consenting to a $100,679.66 remittitur of her past noneconomic damages awards and holding a new trial.

SIGNED at Houston, Texas, this $\underline{5^{th}}$ day of **September, 2019.**


_____
NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE

C:\Users\SHELIA~1\AppData\Local\Temp\notes88842C\624MJMOLNTRemit.docx  190905.0923